**UNITED STATES DISTRICT COURT**

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

September 17, 2007

# NOTICE OF CORRECTION

**From:   Clerk's Office**

**Case Style:    Thompson v. Merck & Co., Inc. et al**

**Case Number:    3:07-cv-00827-MEF**

**This Notice of Correction was filed in the referenced case this date to add  the PDF document attachments for Exhibits G through L previously omitted when docketed.**

**The additional  PDF documents of Exhibits G through L are attached to this notice for your review.   Reference is made to document # 1  filed on   September 13, 2007.**



ELECTRONICALLY FILED
9/5/2007 11:22 AM
CV-2006-000145.00
CIRCUIT COURT OF
RANDOLPH COUNTY, ALABAMA
CHRIS MAY, CLERK

## IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

| | |
|---|---|
| CLIFFORD BAILEY, et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NUMBER: CV-2006-145 |
| | ) |
| MERCK & CO., INC., et al, | ) |
| | ) |
| Defendants. | ) |

RANDOLPH COUNTY

I, Chris May, Clerk of the Circuit Court of Randolph County, Alabama, do hereby certify that above and foregoing is a true and correct copy of _CV07-119 Complete File_ as the same appears of record and on file in my office

Witness my hand and seal, this _10th_ day _Sept._, 200_

_Chris May_
Clerk of the Circuit Court of Randolph County, Alabama

## ORDER

By previous order of August 26, 2007, this Court granted the motion to sever filed by Defendant Merck & Co., Inc. In furtherance of that ruling, this Court hereby orders the Clerk of Court to create seven new case files. The claims of Plaintiff Clifford Bailey only shall remain pending under the case number referenced above (CV-2006-145).

The respective claims of each of the seven remaining plaintiffs shall each be assigned a new civil action number by the clerk. A copy of the original complaint shall be included in each of the seven newly-created court files, a copy of Defendant's Answer, and a copy of the Court's order of August 26, 2007 and this order shall also be included in each of the case files.

The clerk is further authorized to issue notices seeking the remittance of applicable filing fees as may be warranted.

DONE AND ORDERED this 5th day of September, 2007

/s/ Steve Perryman
Circuit Judge

cc:
Thomas J. Knight                    Steven R. Morris
P.O. Drawer 1850                    P.O. Box 814
Anniston, AL 36202                  Wedowee, AL 36278-0814

F. Chadwick Morriss
Ben C. Wilson
Post Office Box 270
Montgomery, Alabama 36101-0270

EXHIBIT
G.



ELECTRONICALLY FILED
9/5/2007 11:22 AM
CV-2006-000145.00
CIRCUIT COURT OF
RANDOLPH COUNTY, ALABAMA
CHRIS MAY, CLERK

### IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

| | |
|---|---|
| **CLIFFORD BAILEY, et al,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **CASE NUMBER: CV-2006-145** |
| | ) |
| **MERCK & CO., INC., et al,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

By previous order of August 26, 2007, this Court granted the motion to sever filed by Defendant Merck & Co., Inc. In furtherance of that ruling, this Court hereby orders the Clerk of Court to create seven new case files. The claims of Plaintiff Clifford Bailey only shall remain pending under the case number referenced above (CV-2006-145).

The respective claims of each of the seven remaining plaintiffs shall each be assigned a new civil action number by the clerk. A copy of the original complaint shall be included in each of the seven newly-created court files, a copy of Defendant's Answer, and a copy of the Court's order of August 26, 2007 and this order shall also be included in each of the case files.

The clerk is further authorized to issue notices seeking the remittance of applicable filing fees as may be warranted.

DONE AND ORDERED this 5th day of September, 2007

/s/ Steve Perryman
Circuit Judge

cc:
Thomas J. Knight                          Steven R. Morris
P.O. Drawer 1850                          P.O. Box 814
Anniston, AL 36202                        Wedowee, AL 36278-0814

F. Chadwick Morriss
Ben C. Wilson
Post Office Box 270
Montgomery, Alabama 36101-0270



IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

CLIFFORD BAILEY, et al,                    *
                                           *
        Plaintiff                          *
                                           *
v.                                         *        CASE NO. CV-06-145
                                           *
MERCK & CO., INC., et al,                  *
                                           *
        Defendant                          *

<u>ORDER</u>

This matter came before the Court on the Defendant, Merck's Motion to Severe. After consideration of the oral arguments, briefs and reading of cases on point, the court makes the following findings of fact and ruling. First, in the litigation at hand, the court is considering whether the joinder of the plaintiffs is proper under Rule 20 of the Rules of Civil Procedure. In order to be proper, Rule 20 requires that the cause of action arise out of the same transaction, occurrence, or series of transactions or occurrences for all plaintiffs. In this case there is no question that the plaintiffs' injuries did not arise out of the same or even similar transactions or occurrences. The court considered the following in making this determination:

1. None of the patients were prescribed Vioxx by the same physician.

2. The plaintiffs took different doses of the medication.

3. The plaintiff's took the medication for different durations.

4. The plaintiff's were in various states of health prior to and during the ingestion of Vioxx.

1

5. The plaintiff's allegedly suffered widely different affects from the ingestion of Vioxx.

6. The plaintiff's allege that Vioxx failed to warn the physicians and the consumers of the dangers of taking Vioxx; however, different warnings, oral and written, were given during the time periods covered by the different plaintiffs. The Patient Package Insert was modified during the periods that the different plaintiffs began taking Vioxx.

For these reasons, the court feels that a joinder of these numerous plaintiffs is improper. The court will look at consolidating some of these plaintiffs pursuant to Rule 42 after further discovery. However, at this time it is **ORDERED, ADJUDGED and DECREED** as follows:

That defendant, Merck & Co., Inc.'s motion to severe is granted. This matter shall proceed as eight different causes of action with each plaintiff proceeding separately.

Done this the 26th day of August, 2007.

/s/ Steve R. Perryman
STEVE R. PERRYMAN
Circuit Judge

2

IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

CLIFFORD BAILEY, CLIFFORD BLACK,      )
WESLEY CALHOUN, CURTIS DEASON,        )
RUTH GRAVES, MICKEY GRIZZARD,         )
JIMMY PERRY, HERBERT STANLEY          )
SIKES and PHILLIP THOMPSON            )
                                      )
    Plaintiffs,                       )
                                      )
                                      )
vs.                                   )      CASE NUMBER: CV-06-~~145~~
                                      )      CV07-119
                                      )
MERCK & CO., INC., a foreign or       )
domestic Corporation, DAVID           )
SPARKMAN, KATHERINE HOLMES,           )
LORI LOVETT, SCOTT BARTLETT,          )
CORAL HARPER, MELISSA SANTIAGO,       )
HENRY MITCHAM, JERRY PHARR,           )
JASON DELK, CHARLES HENDERSON,        )
JAMES HOUSTON, JULIE MELTON,          )
JULIE HODGES, and MELISSA             )
BAUER, NATASHA WALKER-                )
MCGLOTHAN , RANDY WALLS, and the      )
defendants A, B, C, D, E, X & Z whether )
singular or plural, being those persons, )
firms or entities who or which        )
proximately caused or contributed to the) 
Plaintiff's personal injury and Plaintiff's )
other harm and the other              )
damages as complained of herein whose)
true names are unknown to the Plaintiffs)
but will be added by amendment when   )
correctly ascertained,                )
                                      )
    Defendants.                       )

*Filed in Office*

SEP 2 1 2006

KIM S. BENEFIELD
Clerk of Circuit Court

## COMPLAINT

    **NOW COME** the Plaintiffs, Clifford Bailey, Clifford Black, Wesley Calhoun,

Curtis Deason, Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and

Phillip Thompson, and state their claims for relief against defendants Merck & Co., Inc., a

Corporation (hereinafter generally referred to as Merck), Merck Corporation, a trade name

1

or division of Merck & Co., Inc. David Sparkman, Katherine Holmes, Lori Lovett, Scott

Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles

Henderson, James Houston, Julie Melton, Julie Hodges, Melissa Bauer, Natasha Walker-

McGlothan, Randy Walls, and against defendants A, B, C, D, E and F, and X and Z,

whether singular or plural, being those persons, firms or entities who or which proximately

caused or contributed to the Plaintiff's personal injuries and the other damages as

complained of herein whose true names are unknown to the Plaintiffs but will be added by

amendment when correctly ascertained, with the claims being as follows:

## GENERAL AND JURISDICTIONAL ALLEGATIONS

1.      Plaintiffs, Clifford Bailey, Clifford Black, Wesley Calhoun, Curtis Deason,

Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and Phillip Thompson,

are resident citizens of the State of Alabama and of Randolph County. Defendants were

severally the marketer, promoter, seller, manufacturer, distributor and entity which did

manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise,

fail to warn, and otherwise handle and distribute the product, Vioxx. Each defendant does

business in Alabama and in Randolph County, and at all times relevant each sold in

Alabama and in Randolph County, the aforementioned drug, or is otherwise subject to this

Court's jurisdiction. The defendants do business by agent in this state and county and have

caused tortious injury in this state and county by manufacturing and selling a dangerous

and defective product. Each defendant, acting directly or by agent, is legally responsible

to Plaintiffs as a consequence of that defendants' (A) transacting any business in this state,

(B) contracting to supply services or goods in this state, (C) causing tortious injury or

2

damage by an act or omission in this state, (D) causing tortious injury or damage in this state by an act or omission outside this state and the defendant regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this state, (E) causing injury or damage in this state to a person by breach of warranty expressly or impliedly made in the sale of goods outside this state when the defendant might reasonably have expected such other person to use, consume, or be affected by the goods in this state, and the defendant also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state, and otherwise had or has some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the defendant to come to this state to defend an action. The amount in controversy in this civil action exceeds the jurisdictional minimum for the Circuit Courts. This Court has jurisdiction hereof both as to the subject matter and in personam.

2.      Plaintiffs brings this action to recover damages for personal injuries, restitution, refunds, and/or for equitable and declaratory relief against defendants Merck & Co., Inc., a Foreign Corporation, Merck Corporation, a trade name or division of Merck & Co., Inc., and Merck Pharmaceutical Division, a Division of Merck Corporation, (collectively referred to herein as, "Merck" or "defendants"), which developed, tested, designed, marketed, distributed, promoted and sold Vioxx. The defendants David Sparkman, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Melissa Bauer, Natasha Walker-McGlothan, and Randy Walls are,

3

or have been employees of defendant, Merck and are persons who are liable to Plaintiffs and whose conduct is described in detail elsewhere in this Complaint. These defendants are resident citizens of Alabama. These defendants, and other persons whose true names are unknown to the Plaintiffs, set about to sell and market Vioxx throughout the state of Alabama and in such a manner that their conduct was a substantial proximate cause of the injuries suffered by Plaintiffs Clifford Bailey, Clifford Black, Wesley Calhoun, Curtis Deason, Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and Phillip Thompson. Defendants A, B, C, D, E, F, X and Z, whether singular or plural, are those persons, firms or entities who or which proximately caused or contributed to the Plaintiffs' damages as complained of herein whose true names are unknown to the Plaintiffs but will be added by amendment when correctly ascertained. As used in this Complaint, the general word "defendants" includes, incorporates, and is defined to mean, not only the named defendants, but also defendants A, B, C, D, E, F, X and Z, being those persons, firms or entities who or which proximately caused or contributed to the Plaintiffs' personal injuries and the other damages as complained of herein whose true names are unknown to the Plaintiffs but will be added by amendment when correctly ascertained.

3.    Vioxx has been associated with heart attacks, strokes and deaths, including cases of fatal cardiovascular events. Vioxx was recalled and removed from the market because it was unreasonably dangerous and defective.

4.    Excess deaths and cardiovascular events, hypertension, edema, kidney damage, aseptic meningitis, and slow healing of bone fractures are also associated with Vioxx.

5.    The relief sought in this action are actions by the court to (1) provide

4

damages for Plaintiffs' personal injuries, (2) reimburse monies paid for the recalled product, (3) otherwise compensate Plaintiffs, a consumer of Vioxx who has suffered the injuries described elsewhere in this Complaint, (4) to provide other benefits to which the Plaintiffs are entitled under the laws of the State of Alabama, and (5) the other relief sought in this Complaint.

## PARTIES TO THIS CIVIL ACTION

### PARTY Plaintiffs

6.     Plaintiffs, Clifford Bailey, Clifford Black, Wesley Calhoun, Curtis Deason, Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and Phillip Thompson, are resident citizens of the State of Alabama and of Randolph County.   Plaintiffs are residents of this county who prescribed, purchased and used Vioxx.  Plaintiffs, Clifford Bailey, Clifford Black, Wesley Calhoun, Curtis Deason, Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and Phillip Thompson, were prescribed and ingested Vioxx regularly after being prescribed the said drug by his physician.   Plaintiffs suffered personal injuries as a proximate result of the effects of his ingestion of Vioxx.  Plaintiffs experienced symptoms of Vioxx-induced cardiovascular events, suffered personal injury from the product defect in Vioxx and were at increased risk for developing further complications from such condition all as a proximate result of his ingestion of Vioxx.

7.     Plaintiffs, Clifford Bailey, Clifford Black, Wesley Calhoun, Curtis Deason, Ruth Graves, Mickey Grizzard, Jimmy Perry, Herbert Stanley Sikes, and Phillip Thompson were prescribed and consumed the product at the direction of their physicians in the State

of Alabama and in Randolph County.

**PARTIES DEFENDANT**

8.    Defendant, Merck & Co., Inc., is a corporation headquartered and with its principal place of business in Whitehouse Station, New Jersey. Merck & Co., Inc. manufactures, marketed and distributed Vioxx throughout the world, including Alabama. Defendants, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Melissa Bauer, Natasha Walker-McGlothan, and Randy Walls, are persons employed by or associated with defendant, Merck, who are, with other Merck employees, the persons guilty of the conduct, the acts and omissions, specifically described and set forth in detail in this Complaint.

9.    On information and belief defendants David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, are resident citizens of the State of Alabama.

10.    Defendant, X is a corporation or other entity organized under the laws of the state of Alabama and having its principal place of business in the state of Alabama. This entity was or acted in concert with the defendants and is otherwise liable to Plaintiffs as described herein.

11.    Defendant, Z is a corporation or other entity organized under the laws of a state other than Alabama and having its principal place of business in a state other than Alabama. This entity was or acted in concert with the defendants and is otherwise liable

to Plaintiffs as described herein.

12.    At all times relevant hereto, defendants, including defendants A, B, C, D, E, F, X and Z whose true names are unknown to the Plaintiffs but will be added by amendment when correctly ascertained, were engaged in the business of developing, designing, marketing, distributing, promoting, testing, providing warnings concerning, labeling and/or selling the pharmaceutical Vioxx. On information and belief, defendants Merck Pharmaceutical Division and Merck Corporation otherwise were in control of the development, design, assembly, manufacture, warnings concerning, marketing and with others, the sale of Vioxx. As used in this Complaint, the general word "defendants" includes, incorporates, and is defined to mean, not only the named defendants, but also defendants A, B, C, D, E, F, X and Z, being those persons, firms or entities who or which proximately caused or contributed to the Plaintiff's personal injuries and the other damages as complained of herein whose true names are unknown to the Plaintiffs but will be added by amendment when correctly ascertained.

## JURISDICTION AND VENUE

13.    This Court has general subject matter jurisdiction and in personal jurisdiction on grounds as shown above.

14.    Venue is proper in this county in that the substantial relevant facts occurred in this county.

## FACTUAL ALLEGATIONS

15.  Vioxx is the brand name of Rofecoxib, one of the classes of drugs called "Cox-II

7

inhibitors," which are supposed to work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis, and muscle pain.

16. Vioxx has effects on prostaglandins at inflammatory sites, and on prostacyclin, vasodilators and inhibitors of platelet aggregation.

17. Vioxx, manufactured by Merck & Co., has a demonstrated risk that is or was misrepresented by Merck and benefits that were exaggerated and oversold to the public and physicians through an aggressive marketing campaign, while risks were purposefully hidden. Merck has profited tremendously from its misconduct described in this Complaint. Merck has been, with regard to Vioxx, over-promoting drugs that are far more expensive than older versions, but no better at relieving pain, while containing unreasonable risks of harm.

18. When Vioxx (Rofecoxib) and Celebrex (Celecoxib), a new kind of pain medication known as Cox-2 inhibitors, were introduced in 1999, manufacturers and their supporters hailed them as a kind of "super-aspirin" that lacked the stomach-injuring side effects of the older non steroidal anti-inflammatory drugs (NSAIDs). But valid questions soon arose about the efficacy and safety of Cox-2 drugs. Celebrex is discussed herein because of the chemical similarity, and the notice to Merck provided by Celebrex events. Pharmacia Corporation makes Celebrex, which it describes as "a major advance in the treatment of the debilitating diseases osteoarthritis and rheumatoid arthritis, because of its efficacy and excellent gastrointestinal safety profile."

19. The drugs, approved to treat arthritis, menstrual pain and "acute" pain in adults, have been heavily marketed to both doctors and consumers: Merck as to Vioxx,

which ran ads featuring former Olympic figure skater Dorothy Hamill, and spent over $160 million on consumer advertising in 2000; Celebrex spent almost $80 million, according to AdWatch, the health policy arm of the Henry Kaiser Family Foundation. The campaigns worked: In 2001, Vioxx, the 13th most prescribed drug in the United States, had worldwide sales of $2.6 billion.

20.    Older NSAIDs, such as ibuprofen, Naproxen and Diclofenac, work by inhibiting the two types of cyclooxygenase enzyme, one of which causes inflammation and thus pain. The Cox-1 enzyme, however, helps maintain the muscle surface of the gastrointestinal (GI) tract, so suppressing the enzyme can increase perforations, ulcers and bleeding. Vioxx, Celebrex and Bextra (Valdecoxib, introduced by G.D. Searle & Co. in 2001) suppress only the second enzyme, supposedly leaving the first alone to protect the GI tract.

21.    Merck's Vioxx Gastrointestinal Outcomes Research Study (VIGOR), performed from January 6, 1999 through March 17, 2000, involved about 8,000 participants and assessed only the drug's effects on the stomach; the company ordered no end-point analyses for effects on the cardiovascular system.

22.    The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking 50mg of Vioxx daily compared to patients in the group taking Naproxen 1000mg/day," and (2) "study the safety and tolerability of Vioxx in patients with rheumatoid arthritis."

23.    The VIGOR data revealed that: (a) patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on Naproxen; and (b) patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart

attacks, ischemic stroke, unstable angina and sudden unexplained death) as compared to patients on Naproxen.

24.    The study concluded that Vioxx takers had a lower rate of GI distress than those taking naproxen. The researchers noted, "the incidence of myocardial infarction was lower among patients in the naproxen group than among those in the Rofecoxib group," but found "the overall mortality rate and the rate of death from cardiovascular causes were similar in the two groups." They drew conclusions only about clinical upper gastrointestinal events, bleeding and ulcers. Stroke is caused by Vioxx with the same mechanism as myocardial infarction.

25.    On March 27, 2000, Merck issued a press release stating that Vioxx caused fewer digestive tract problems than Naproxen.  The press release further stated that the VIGOR results did not show that Vioxx caused cardiovascular problems, but that Naproxen protected against them.

26.    After the VIGOR results were released, the FDA said Merck had minimized the fourfold to fivefold increase in heart attacks among study participants taking Vioxx compared with those taking Naproxen. It found the company's explanation that Vioxx did not increase the risk of heart attacks, but instead, Naproxen protected those taking it from heart attacks because the drug can thin the blood, like aspirin unacceptable. In a September 2001 warning letter to Merck, the FDA wrote, "You fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation: that Vioxx may have pro-thrombotic properties."

27.    While Vioxx and Celebrex have been marketed as safer than traditional NSAIDs because of their stomach-protecting propensity, reports of serious side effects

10

have now emerged. The defendants knew the salient facts concerning their drug long before the discovery of dangers by outside researchers, but ignored or concealed risks and dangers and continued to misrepresent the safety (or lack of safety) of Vioxx. In June 2000, a research team led by A. Whelton noted in a presentation to the European United League Against Rheumatism (EULAR), of which Merck is a member and corporate sponsor, that Vioxx use resulted in a statistically significant increase in hypertension, myocardial infarction, and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but in August 2000, it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, "Pharmacy Today." The medical journal,"The Lancet," published a study associating Vioxx with kidney failure, and other studies have associated both Vioxx and Celebrex with heart problems, kidney damage, aseptic meningitis and slow healing of bone fractures.

28.    A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies funded by the drug companies and two smaller ones, all for cardiovascular risks. (Debabrata Mukherjee et al., Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors, 286 JAMA 954 (2001).) It found that neither Pharmacia/Pfizer nor Merck had identified and studied cardiovascular risks for their products. The annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded. Defendants set about to discredit and deny these studies.

11

29.   The FDA, which lists Vioxx and Celebrex information on the "Hot Topics" section of its Web site, required both drugs to carry the same stomach-upset and bleeding warnings ibuprofen and Naproxen had when the agency approved them in 1999.

30.   After the CLASS results, the FDA found that Celebrex is just as likely to cause ulcers as older NSAIDs and is no better at reducing pain or inflammation than ibuprofen. In June 2002, it mandated a new label for the drug, one without any claim that it is safer for the stomach than other NSAIDs.

31.   Because of information provided by Merck, the agency did allow Merck to change its Vioxx label to claim it has a lower risk than older NSAIDs of causing ulcers, gastrointestinal bleeding and other digestive-tract complications.

32.   As early as November 1999, an FDA memo stated that the board monitoring the VIGOR study was concerned about "excess deaths and cardiovascular events experienced in Group A [Vioxx group] compared to Group B [Naproxen]." In March 2002, the FDA reported that five people taking Vioxx had aseptic meningitis, an inflammation of membranes on the brain and spine. In April 2002, after the agency warned Merck that it had misrepresented the drug's safety and minimized potentially serious cardiovascular complications found in VIGOR, it required the company to include a warning of cardiovascular risks on the Vioxx label.

33.   The new warnings contained information long held by Merck, but consistent with later pattern and practice, concealed from consumers and their physicians. The new warnings included:

34.   "In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, Naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious

cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with Naproxen 500 mg twice daily (n=19)." ...

35.    "In a placebo-controlled database derived from 2 studies with a total 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075 with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs. 35 for patients treated with VIOXX (Rofecoxib tablets and oral suspension) 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs. 3 for VIOXX versus placebo, respectively."

36.    Merck has repeatedly blamed its customers' cardiovascular events on underlying conditions, to avoid blaming Vioxx. The prestigious New England Journal of Medicine later stated in regard to "the implications of these observations with respect to selective cyclooxygenase-2 inhibitors": "...thrombosis would be expected to occur in patients who are already at increased risk because of other underlying conditions" and "In the VIGOR trial... The rates of nonfatal myocardial infarction, nonfatal stroke, and death from any vascular event were higher in the Rofecoxib group than in the naproxen group (0.8 percent vs. 0.4 percent, P<0.05). This difference was largely due to a difference in the incidence of myocardial infarction (0.4 percent in the Rofecoxib group vs. 0.1 percent in the naproxen group, P<0.01). In contrast, in the CLASS trial, in which 21 percent of the patients took aspirin, there was no significant difference the treatment groups in the incidence of major cardiovascular events." NEJM Volume 345:433-442 August 9, 2001 Number 6.

13

37.    In 2002 and 2003, unknown to Plaintiffs and their doctors, Merck refused requests from the American Heart Association the National Stroke Association and the Arthritis Foundation that it conduct additional safety studies, claiming that Vioxx was safe and that it did not plan to conduct any such study.

38.    On October 30, 2003, an article in The Wall Street Journal, unknown to Plaintiffs or their doctors, reported that another study sponsored by Merck, and presented at the annual meeting of the American College of Rheumatology, confirmed an increased risk of heart attacks in patients taking Vioxx. According to the Wall Street Journal, within the first 30 days of taking Vioxx, the risk of a heart attack was increased by 30% as compared to Celebrex. This study looked at the records of 54,475 Medicare patients, all of whom were over 65, and was described by the eminent Dr. Eric Topol as "the best study to date."

39.    In 2003, unknown to Plaintiffs and their doctors, Dr. Jerry Avorn, a Divisional Director at Brigham and Women's Hospital in Boston and colleague Dr. Daniel H. Solomon reported in a Merck-financed study based on a survey of patient records, that Vioxx, even at some moderate dosages, increased cardiovascular risks.

40.    Merck disputed the findings of the Avorn-Solomon study, and the name of the Merck epidemiologist who had contributed to the study was removed from the report before it was published in a medical journal.

41.    From January through June, 2004, Merck spent an estimated $45 million on Vioxx advertising.

42.    In May 2004, the results of a study funded by the Canadian government were published in "The Lancet." The study reviewed data from 1.3 million elderly patients

(66 and older) taking Vioxx, Celebrex, a common arthritis pain pill (NSAID) or no medication. The records from approximately 130,000 persons randomly reviewed from the population base found that persons taking Vioxx had an 80% increase in hospital admissions for congestive heart failure within one year of taking Vioxx when compared to persons taking NSAIDS.

43.     On August 25, 2004, still unknown to Plaintiffs and thier doctors, Dr. David Graham, Associate Director for Science in the FDA's Office of Drug Safety, presented results of a database analysis of 1.4 million patients that showed Vioxx users are more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or an older NSAID.

44.     Despite the foregoing, on August 26, 2004, Merck continued to represent to physicians and consumers that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug.  Merck stated in a press release that "Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

45.     On September 30, 2004, Merck finally withdrew Vioxx from the market after basically admitting to additional information from its own studies that study participants taking Vioxx after 18 months had twice as high a risk of cardiovascular events as the placebo group.

46.     Defendants, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls,  and Melissa Bauer,  being the professional

staff of Merck for the sales of Merck's products in the state of Alabama were aware of all of the facts, points and details relevant to the dangers of Vioxx. Knowing these facts, the defendants had a duty to inform, immediately, the doctors to whom they had given samples or otherwise sold Vioxx or promoted Vioxx to such doctors and other persons, of the important facts described in this complaint. This duty was fully applicable to the said defendants, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and their employer, Merck, prior to the time that the Plaintiffs' use of Vioxx. The said defendants David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and defendant Merck, had a full duty, obligation, and responsibility, to advise and warn, and to disclose that the facts that they had previously provided were no longer true or correct.

47.    The said defendants, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and their employer, Merck, were both negligent and wanton in their failure to perform their duties and obligations under applicable law to advise all customers of Merck taking Vioxx directly or through their physicians of the dangers now known and disclosed, but said defendants and each and every one of them failed in his said duty imposed by law. The said defendants,

16

David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and their employer, Merck, failed to exercise ordinary and reasonable care in the performance of their job functions and duties.

48.    The said defendants David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and their employer, Merck, knew the foregoing true facts concerning Vioxx, prior to their representations concerning the safety and efficacy of Vioxx, but nevertheless, continued to represent that the product was safe and effective. The true facts, as indicated above, were that the said drug, Vioxx, was unreasonably unsafe and unreasonably dangerous, but the said individual defendants and their employer, Merck, willfully misrepresented the facts to physicians and others in the state of Alabama with the plan, design and intent to market the dangerous and defective drug notwithstanding the knowledge of the dangers and defects, this conduct constitutes actionable fraud and deceit, and these misrepresentations were relied upon by the medical community, physicians, the public and the Plaintiffs to the detriment of the Plaintiffs in particular, and the customers of Merck, receiving Vioxx in general. The actions of defendants and others combined and concurred to constitute a conspiracy for which they are civilly liable.

49.    The acts and omissions of the defendants as described in this Complaint constitute fraudulent suppression of material facts sufficient to toll the running of any and all statutes of limitation, notice provisions, or other similar laws or requirements. Further,

17

the pendency of class actions describing and designating persons in the class including

and occupied by the Plaintiffs herein, constitutes sufficient commencement of an action to

toll the statutes of limitations and other notice provisions under applicable law.

50.     The defendants, David Sparkman, Natasha Walker-McGlothan, Katherine

Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry

Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges,

Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and their employer, Merck,

misrepresented material facts, and fraudulently suppressed material facts, including but

not limited to those detailed in this complaint, to the medical community in general, the

Alabama physicians, and the Plaintiffs' treating physicians in particular, with regard to the

safety and effectiveness of the drug, Vioxx, which material misrepresentations and

fraudulent suppressions, proximately caused the injuries, losses, and damages specified

elsewhere in this complaint.   The defendants, David Sparkman, Natasha Walker-

McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago,

Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie

Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls,  and Melissa Bauer, and

their employer, Merck, , personally visited and otherwise called on Plaintiffs' prescribing

physicians, and conspired and combined among themselves and with others, to cause the

Plaintiffs' prescribing physicians to believe that Vioxx was safe and effective, when in fact

it was not safe or effective to sufficiently outweigh the unreasonable risks of harm posed

by Vioxx and the said defendants otherwise committed actionable fraud,

misrepresentation, and fraudulent suppression which proximately caused the injuries to the

Plaintiffs described elsewhere herein.  Plaintiffs did not know, and could not have known,

that Vioxx was unsafe or that it had caused their injuries and damages, until after not

18

earlier than September 30, 2004. Then data was released November 13, 2005, at the *American Heart Association* conference in Dallas, Texas, that was a study of 58,000 patients, which showed that heart disease patients taking 25 mg of Vioxx per day were five times as likely to die as patients not taking the drug. Defendants continued to conceal, suppress and secrete, important, relevant and crucial material information held by them and not by others.

51.    While today Merck warns of "heart attacks and similar serious events have been reported in patients taking Vioxx" at the time this information was hidden and concealed, and representations were made by the defendants that indicated that the product was, instead, safe and effective.

52.    As a result of the reliance by Plaintiffs, the medical community, and the public generally on the representations and statements of the defendants, including the individual defendants herein and Merck, the Plaintiffs took and consumed Vioxx. As a proximate result and consequence of his ingestion of Vioxx and as a direct and proximate consequence and result of the acts and omissions of the defendants including the individual defendants as described herein, Plaintiffs were injured.

53.    Merck was well aware of the Pharmacia-sponsored Celebrex Long-Acting Safety Study (CLASS), also involving about 8,000 arthritis sufferers, compared that drug to the older NSAIDs ibuprofen and diclofenac to determine whether it was less harmful to the stomach. In a JAMA article in 2000, the researchers published data accumulated over six months and concluded that Celebrex caused fewer ulcers than the older drugs. (Fred E. Silverstein et al., Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial, 284 JAMA 1247 (2000). However, researchers at that point

had 12 months of data that, when analyzed as a whole, showed no significant difference.

54.    The FDA said the CLASS study "did not show a safety advantage in upper gastrointestinal events for Celebrex compared to either ibuprofen or diclofenac." Because some of the study participants were also taking aspirin, which does affect the stomach, some analysts say the results may have been skewed. The company maintained that among those not taking aspirin, the rate of ulcers was lower in Celebrex takers. Again, Celebrex is relevant to this case because of the knowledge and notice provided to Merck and its defendant-employees.

55.    In a June 2002 editorial, the British Medical Journal said the Celebrex study misled consumers with "overoptimistic" data. It said the study was "seriously biased" because the complete results "clearly contradict[ed] the published conclusions" and showed a similar number of stomach complications in all patients, whether they took Celebrex or the older pain relievers.

56.    It has been reported that a substantial number of deaths worldwide have been associated with Vioxx.

57.    Plaintiffs seek, in addition to damages for personal injury, refunds of and restitution for monies paid as a result of their purchase of Vioxx, as well as all other ascertainable economic loss that occurred as a result of defendants' wrongful and improper conduct in connection with the manufacture, marketing, distribution, testing, promotion, labeling and/or selling of Vioxx. Plaintiffs therefore seek to have the defendants return the monies unlawfully and inappropriately acquired by them as a result of their sale of Vioxx.

58.    Plaintiffs seek to have defendants fully disclose and account for, and effect the accumulation and analysis of relevant medical information on Vioxx, including, but not

limited to, the results of all appropriate diagnostic tests performed as part of a medical research and for medical information concerning all persons as gathered, maintained and analyzed, and for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of Vioxx-induced personal injuries, and all this should be disclosed to Plaintiffs in this litigation.

## PLAINTIFFS' CLAIMS FOR RELIEF
## COUNT I

### PRODUCTS LIABILITY UNDER AEMLD AND STRICT LIABILITY PURSUANT TO §402A OF THE RESTATEMENT (SECOND) OF TORTS

59.     Plaintiffs incorporate by reference and re-alleges, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

60.     Defendants are manufacturers and/or suppliers of Vioxx and each had an opportunity to inspect the product which was superior to the knowledge or opportunity of the consumer's herein. The defendants were engaged in the business of manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing Vioxx in interstate commerce, which they sold and distributed throughout the world, including the State of Alabama, to Plaintiffs.

61.     The Vioxx product supplied, distributed and manufactured by Merck, and A,

B, C, D and E and placed in the stream of commerce by defendants, and others were

defective and unreasonably dangerous in design, manufacture and/or formulation in that,

when it left the hands of the defendants as manufacturer and/or suppliers, the foreseeable

risks exceeded the benefits associated with the design or formulation and they were

unreasonably dangerous and defective. Plaintiffs show that they suffered injuries and

damages as a result of the sale by defendants who sold the product in defective condition

unreasonably dangerous to the ultimate consumer, and all the sellers were engaged in the

business of selling such product and product was expected to and did reach the user or

consumer without substantial change in the condition in which it is sold. The Plaintiffs were

using Vioxx in a manner for which it was intended or in a reasonably foreseeable manner.

62.     Vioxx was expected to and did reach the Plaintiffs without substantial change

in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged,

supplied, marketed, sold, advertised, undertook to warn, and otherwise distributed.

63.     The Vioxx manufactured by Merck, and/or A, B, C, D and E and supplied by

them was defective in manufacture, design or formulation, in that, when it left the hands

of the manufacturer and/or suppliers, it was unreasonably dangerous, in that it not meet

the reasonable expectations of the ordinary consumer as to safety, and was more

dangerous than an ordinary consumer would expect and more dangerous than other pain

relievers. The Plaintiffs show  that the product was unreasonably dangerous when it left

the defendants' control, that it was substantially unaltered when the Plaintiffs used it, and

that it proximately caused the Plaintiffs' injuries. The Plaintiffs were not aware of, and in

the exercise of reasonable caution could not have discovered, the dangerous nature of

Vioxx.

64.     The Vioxx manufactured and/or supplied by defendants was also defective

due to inadequate warning or instruction because the manufacturers and suppliers knew or should have known that the products created an unreasonable risk of harm to consumers and the defendants failed to adequately warn of said risks. The defendants' Vioxx caused increased risks of excess deaths and cardiovascular events, as well as kidney damage, aseptic meningitis, and slow healing of bone fractures upon consumption, and therefore constitute a product unreasonably dangerous for normal use due to their defective design, defective manufacture, and the defendants misrepresentations and inadequate facts disclosed to the Plaintiffs and their doctors. The Vioxx manufactured and/or supplied by defendants was defective due to inadequate care in marketing and post-marketing warnings or instruction because, after the defendants knew or should have known of the risk of injury from Vioxx and/or combination use of these drugs, they failed to provide adequate warnings to users or consumers of the product and continued to promote the product.

65.    As a direct and proximate result of defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiffs have suffered the injuries described elsewhere in this Complaint and was at an increased risk of and did in fact suffer by developing and suffering a cardiovascular event and has suffered damages and Plaintiffs are entitled to compensatory and punitive damages in an amount just and proper under law for personal injuries and other recoverable damages.

66.    The defendants, therefore, are liable to the Plaintiffs. The conduct of Merck and A, B, C, D and E was gross, willful, wanton, oppressive, intentional, burdensome, and otherwise such as to justify the imposition of punitive damages under Alabama law. Additionally, defendants' conduct was so outrageous as to constitute ill will, bad motive and

23

reckless indifference to the interests of the consumers. The Plaintiffs, therefore, are entitled to punitive damages. All of the defendants are liable to Plaintiffs jointly and severally for all general, special and other relief to which the Plaintiffs are entitled by law. As a consequence of the producing cause and as a legal result of the dangerous and defective condition of Vioxx as sold, developed, designed, marketed, manufactured and/or supplied by defendants, and as a direct and legal result of the tort, AEMLD violation, negligence and wantonness, carelessness, other wrongdoing and action(s) of defendants described herein:

67.    Plaintiffs were injured in their health, strength and activity and suffered injuries to body and mind;

68.    Plaintiffs have sustained economic loss, loss of earnings and diminution or loss of earning capacity, the exact amount of which is presently unknown;

69.    Plaintiffs required reasonable and necessary health care, attention and services and did incur medical, health, incidental and related expenses. As a direct and proximate result of defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiffs have suffered the injuries described elsewhere in this Complaint and Plaintiffs have suffered damages and are entitled to recover compensatory and punitive damages in an amount just and proper under law for personal injuries and other recoverable damages.

## COUNT II

## NEGLIGENCE AND WANTONNESS

70.    Plaintiffs incorporate by reference and reallege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever

24

contained.

71.    It was the duty of the defendants to use reasonable care in the manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing Vioxx.

72.    Contrary to their duty, the said defendants were guilty of one or more of the following careless, negligent and wanton acts and/or omissions:

Said defendants failed adequately and properly to test, study and inspect Vioxx so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold;

Failed to utilize and/or implement a reasonably safe design in the manufacture of Vioxx;

Failed to manufacture Vioxx in a reasonably safe condition for which it was intended;

Failed to adequately and properly warn Plaintiffs purchasing Vioxx of the risks of complications when used in a manner for which it was intended;

Failed to adequately and properly warn Plaintiffs purchasing Vioxx of the risks of diseases when used in a manner for which it was intended;

Failed to adequately and properly label Vioxx so as to warn the Plaintiffs of the risks of complications;

Failed to adequately and properly label Vioxx so as to fairly and sufficiently warn the Plaintiffs of the risks of excess deaths and cardiovascular events as well as kidney damage, aseptic meningitis, and slow healing of bone fractures;

Manufactured Vioxx which constituted a hazard to health;

Manufactured Vioxx which caused adverse side effects;

25

Sold and pushed Vioxx and handed out samples thereof while misrepresenting through word, deed, actions, distributing printed and other materials, all of the most important information concerning the dangers of Vioxx including especially the danger posed of sudden cardiovascular death; and were otherwise careless, negligent and wanton.

73.    As a direct and proximate result of defendants' manufacturing, creating, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx in interstate commerce, Plaintiffs have suffered the injuries described elsewhere in this Complaint and Plaintiffs have suffered damages and are entitled to recover compensatory and punitive damages in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT III

### NEGLIGENCE PER SE

74.    Plaintiffs incorporate by reference and reallege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

75.    Defendants Merck, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and the fictitious defendants, had an obligation not to violate the law in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale and warning of the risks and dangers of Vioxx.

76.     Defendants, Merck, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and the fictitious defendants, violated Alabama Code §20-1-26, §20-1-27, and §8-19-5, et seq., related amendments and codes and regulations provided there under, and other applicable laws, statutes and regulations. No action is brought herein for violation of federal statutes, but claim is made for violation of the foregoing and any other state's applicable laws.

77.     Plaintiffs, as purchaser and consumer of Vioxx, are within the class of persons the state statutes and regulations described above are designed to protect and Plaintiffs' injuries are the type of harm these statutes are designed to prevent.

78.     The defendants, Merck, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and the fictitious defendants made false and fraudulent misrepresentations to physicians, Plaintiffs, and the general public that Vioxx is or was safe, effective, fit for its use as designated, and that it's components are not hazardous to the health of users all in violation of Alabama Code § 20-1-26 and 20-1-27 and other applicable law. defendants' acts constitute a breach of duty subjecting defendants to civil liability for all damages arising therefrom, under theories of negligence per se. Alabama Code §20-1-27 states that "No person shall engage in any of the following activities within this state:(1) Manufacture for sale herein, have in his or his possession with intent to sell, offer or expose for sale, sell, or deliver any article of food or drugs which is adulterated or misbranded within the meaning of this division."

79.   Said defendants failed to meet the standard of care set by the following statutes and regulations, which were intended for benefit of individuals such as Plaintiffs, making defendants negligent per se:

80.   The defendants made false and fraudulent misrepresentations to physicians, Plaintiffs, and the general public that Vioxx is or was safe, effective, fit for its use as designated, and that it's components are not hazardous to the health of users all in violation of Alabama Code § 20-1-26 and 20-1-27 and other applicable law;

81.   The labeling did bear or contain statements, designs or devices regarding the curative or therapeutic effect of Vioxx which were false or fraudulent and which concealed, in that they failed to provide adequate warnings of, severe and disabling medical side effects and conditions including, without limitations, cardiovascular events, hypertension and edema, as well as kidney damage, aseptic meningitis, and slow healing of bone fractures, excess deaths and adverse events and other adverse medical conditions as soon as there was reasonable evidence of their association with the drug;

82.   There was misleading and inadequate information for patients for the safe and effective use of defendants' drug in that a drug shall be deemed misbranded "if its package or label shall bear or contain any statement, design or device regarding the curative or therapeutic effect of such article or of any of the ingredients or substances contained therein which is false or fraudulent"; and

83.   There was misleading and inadequate information regarding special care to be exercised by the doctor for safe and effective use of defendants' drug, and the drug was therefore, misbranded.

84.   As a proximate result of the defendants' violations of the statutes described

above, Plaintiffs suffered injuries and personal injuries and damages as alleged herein.

## COUNT IV

### UNJUST ENRICHMENT

85.     Plaintiffs incorporate by reference and reallege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

86.     As the intended and expected result of their conscious wrongdoing, defendants have profited and benefitted from the purchase of Vioxx by the Plaintiffs, to wit: (a) defendants have voluntarily accepted and retained these profits and benefits, derived from the Plaintiffs, with full knowledge and awareness that, as a result of defendants' fraud and other conscious and intentional wrongdoing, Plaintiffs were not receiving a product of the quality, nature, or fitness that had been represented by defendants or that Plaintiffs, as a reasonable consumer, expected.  (b) By virtue of the conscious wrongdoing alleged in this Complaint, defendants have been unjustly enriched at the expense of the Plaintiffs, who are entitled to in equity, and hereby seeks, the restitution of defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the jury; and such other relief as the jury deems just and proper to remedy the defendants' unjust enrichment.

## COUNT V

### BREACH OF EXPRESS WARRANTY

87.     Plaintiffs incorporate by reference and re-allege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

88.     Defendants expressly warranted to Plaintiffs, by and through statements

29

made by defendants or their authorized agents or sales representative, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Vioxx was safe, effective, fit and proper for its intended use.

89.    In using Vioxx, Plaintiffs relied on the skill, judgment, representations and foregoing express warranties of the defendants. Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was intended.

90.    As a direct and proximate result of defendants breaches of warranties, Plaintiffs have suffered the injuries described elsewhere in this Complaint and Plaintiffs were at an increased risk of and did, in fact, suffer by developing cardiovascular events and has suffered damages for which Plaintiffs are entitled to recover from defendants in an amount just and proper under law for personal injury and other recoverable damages.

## COUNT VI

### BREACH OF IMPLIED WARRANTY

91.    Plaintiffs incorporate by reference and re-allege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

92.    Prior to the time that Vioxx was used by Plaintiffs, defendants impliedly warranted to Plaintiffs that Vioxx was of merchantable quality and safe and fit for the use for which it was intended.

93.    Plaintiffs were unskilled in the subject of pharmacology or the research, design and manufacture of Vioxx and reasonably relied entirely on the skill, judgment and implied warranty of the defendants in using Vioxx.

94.   Vioxx was neither safe for its intended use nor of merchantable quality, as warranted by defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries and death to the user.

95.   As a direct and proximate result of defendants' breaches of warranties, Plaintiffs have suffered the injuries described elsewhere in this Complaint and Plaintiffs were at an increased risk of and did, in fact, suffer by developing cardiovascular events and have suffered damages for which Plaintiffs are entitled to recover from defendants in an amount just and proper under law for personal injuries and other recoverable damages.

## COUNT VII

### CORPORATE RESPONSIBILITY:

### JOINT VENTURES, PARENT/SUBSIDIARIES,

### AND/OR SUCCESSOR CORPORATION

96.   Plaintiffs incorporate by reference and re-allege, as if fully set forth herein, each and every allegation contained in the other paragraphs of this Complaint, wherever contained.

97.   As a result of their control or participation in various joint ventures, parent/subsidiary relationships and/or successor corporations, defendants are liable to the Plaintiffs.

98.   As a result of their negligent and wanton supervision and actual supervision of various joint ventures, parent/subsidiary relationships and/or successor corporations, defendants are liable to Plaintiffs.

99.   As a result of the existence or invalidity of various indemnification agreements, defendants are liable to Plaintiffs.

100.   Defendants are liable to Plaintiffs, as alter egos of their joint ventures, parent/subsidiary relationships and/or successor corporations.

## COUNT VIII

### CIVIL CONSPIRACY

101.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

102.   Defendants, Merck, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, and Melissa Bauer, and fictitious defendants combined and conspired to do those acts complained of in Count I through Count IX, as a result of which the Plaintiffs have suffered harm, damages and injuries as previously described.

## COUNT IX

### FRAUD AND DECEIT

103.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

104.   Merck and the sales representative defendants made material misrepresentations of fact to the medical community, the Plaintiffs, the public generally, the governmental entities charged with the protection of the public from unsafe drugs, and to opinion leaders in the medical profession, intentionally in some cases and often with the specific intention of deceiving all these for monetary gain to the defendants, and in some cases negligently and wantonly, and even in rare cases, innocently, in all instances, with the intent and purpose to advance the sales of the dangerous drug Vioxx. The defendants

further suppressed material facts as to which they were under a duty to communicate to all of the above persons and entities. The misrepresentation and suppression was, in each case, of material and important facts essential for the health and safety of the public and of Plaintiffs in particular. As a result of the misrepresentations, deceit, and suppression by the defendants as set forth previously in this Complaint and as set forth below, these parties, and Plaintiffs were deceived and defrauded, and as a direct and proximate result of the said deceit, fraud, misrepresentation, and fraudulent suppression the Plaintiffs suffered the harm and injury as set forth in this Complaint.

105.    By the time Merck voluntarily withdrew the anti-inflammatory drug Vioxx from the market in September 2004, more than 100 million prescriptions had been dispensed in the United States. Yet the vast majority of these prescriptions were written by physicians after Merck and the Sales Representative defendants knew that evidence of Vioxx's risks had already surfaced. Even as evidence mounted in defendants' hands that use of Vioxx was associated with heart attacks and strokes, physicians continued to prescribe Vioxx to millions of patients. The reason is the fraudulent scheme perpetrated by the defendants. A major part of the explanation may be found by examining the strategies that Merck and its sales representatives used to market Vioxx to physicians. Based on Merck documents, Merck sent over 3,000 highly trained representatives, including the individual defendants herein, into doctors' offices and hospitals armed with misleading information about Vioxx's health risks. The documents indicate that Merck instructed these representatives to show physicians a pamphlet indicating that Vioxx might be 8 to 11 times safer than other anti-inflammatory drugs, prohibited the representatives from discussing contrary studies (including those financed by Merck) that showed increased risks from Vioxx, and launched special marketing programs — named "Project XXceleration" and "Project Offense" and

"Dodgeball"— to overcome the cardiovascular "obstacle" to increased sales.

106.    On information and belief, Plaintiffs aver that while some sales representatives eventually refused to continue with this course of conduct, other representatives, including the individual defendants herein, continued with the misrepresentations and fraudulent concealment, notwithstanding knowledge of the falsity and of the dangers to patients. The Sales Representative defendants were provided two types of materials relevant to drug safety and effectiveness: "approved" and "background" materials. The "approved" items were to be aggressively used in pushing Vioxx because they were things like medical journal articles favorable to Merck. On the other hand, the "background" materials also contained things unfavorable to Vioxx, and the Sales Representative defendants suppressed this information from the prescribing doctors as Merck requested.

107.    The documents reveal that Merck exhaustively trained its representatives on how to persuade doctors to prescribe Vioxx and other Merck products. No interaction with physicians appears to have been too insignificant for instruction. Merck representatives were taught how long to shake physicians' hands (three seconds), how to eat their bread when dining with physicians ("one small bite size piece at a time"), and how to use "verbal and non-verbal" cues when addressing a physician to "subconsciously raise... his/her level of trust." Merck instructed its representatives on the various personality types of doctors (including "technical," "supportive and expressive") and recommended targeted sales techniques for each type. And Merck rewarded its sales force with thousands of dollars in cash bonuses for meeting sales goals.

108.    The company assigned individual doctors a "Merck potential" and graded them on how often they prescribed Merck products. The Sales Representative defendants

34

were also involved in the Merck scheme to communicate misinformation about Vioxx to what defendants called "thought leaders" in the medical community. By this device, defendants could sell more Vioxx even to those doctors to whom they did not or could not speak directly or in detail. The "thought leaders" were to influence the medical community to push more Vioxx, despite the dangers, since they could "influence colleagues through peer-to-peer relationships." To help them do this, the Sales Representative defendants used Merck-paid honoraria (money) to these "thought leaders" to influence the medical community to favor Vioxx and to prescribe it notwithstanding the dangers.

109.    The documents describe in detail how Merck used this highly trained sales force to respond to reports of Vioxx's safety risks. The first public indication that Vioxx posed a heightened risk of heart attack and stroke came in March 2000, when Merck's VIGOR study showed a five-fold increase in the risks of heart attacks in patients on Vioxx compared to patients on Naproxen. This study was followed by cautionary discussions of the cardiovascular risks of Vioxx at a meeting of an advisory committee to the Food and Drug Administration in February 2001, in a New York Times article in May 2001, and in a paper in the Journal of the American Medical Association in August 2001.

110.    After each of these developments, Merck sent bulletins or special messages to its sales force, directing them to use highly questionable information to assuage any physician concerns.

111.    For example, the Merck documents show:

After Merck's VIGOR study reported increased heart attack risks, Merck directed its sales force to show physicians a "Cardiovascular Card" that made it appear that Vioxx could be 8 to 11 times safer than other anti-inflammatory drugs. This card omitted any reference to the VIGOR findings

and was based on data FDA considered to be inappropriate for a safety analysis.

After the FDA advisory committee voted that physicians should be informed about the risks found in the VIGOR study, Merck sent a bulletin to its sales force that advised: "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS COMMITTEE ... OR THE RESULTS OF THE ... VIGOR STUDY." If physicians asked about the VIGOR study, Merck representatives were directed to respond, "I cannot discuss the study with you." After the New York Times reported on the cardiovascular dangers of Vioxx, Merck instructed its field staff to tell physicians that patients on other anti-inflammatory medications were eight times more likely to die from cardiovascular causes than patients on Vioxx. The Merck bulletin told its sales force to show physicians the Cardiovascular Card and state: "Doctor, as you can see, Cardiovascular Mortality as reported in over 6,000 patients was Vioxx .1 vs. NSAIDS .8 vs. Placebo 0."

112.   After extensive negotiations, FDA and Merck agreed on a label change for Vioxx in April 2002, that mentioned the cardiovascular findings from the VIGOR study. The final label included the statement that the significance of these findings were "unknown." According to the documents, Merck instructed its representatives to emphasize this statement on new labels to counter physician safety concerns. Merck documents show that in fact the cardiovascular risks were actually well-known, but suppressed, by defendants.

113.   Merck and other drug companies maintain publicly that their representatives play a vital role in the health care system by educating physicians about new drugs and ongoing research. But the Merck documents reveal another side to company marketing

efforts. The documents show that Merck trained its representatives to capitalize subtly on every interaction with physicians to promote Merck products. When concerns about Vioxx's safety arose, Merck used this highly trained force to present a misleading picture to physicians about the drug's cardiovascular risks. Merck's and the Sales Representatives' promotional efforts explain in large part why Vioxx sales remained strong even as the evidence of the drug's dangers mounted. Prescribing doctors were massively misled.

114.    The Sales Representative defendants represented to the Plaintiffs' prescribing physicians false and misleading information concerning the drug Vioxx. The defendants, pursuant to the defendants' "Dodgeball" program and other plans to misrepresent the safety of Vioxx, communicated that the drug was safe for the cardiovascular system, and did not increase the risk stroke or heart attack. The Plaintiffs' physicians did prescribe the subject drug to the Plaintiffs, as a result of, and in reliance upon, the misrepresentations by the defendants' including the Sales Representative defendants who made direct communications to the physician. The physicians made determinations concerning the use of this medication based on false and fraudulent information provided by the defendants including the Sales Representative defendants, and did not act in their proper role as a learned professional in that physicians were given wrongful, false, incomplete, misleading and wrong information by the defendants, including the Sales Representative defendant.

115.    The negligence and wantonness of the defendants, including the Sales Representative defendants, was the proximate cause of the injuries and death suffered by Plaintiffs. Because the Plaintiffs' physicians were prevented from exercising and operating in their full role as learned professionals, because of missed information given to them by defendants, they were deprived of the full and adequate information needed to act in a

learned manner in deciding and determining how to prescribe pain relieving medication to

the Plaintiffs, with the proximate result and consequence that the physicians did in fact

prescribe the dangerous and deadly drug, Vioxx, to Plaintiffs, causing their injuries.

116.    The Plaintiffs suffered personal injuries as a direct and proximate result and

consequence of the wrongful acts and omissions of each of the defendants. The Plaintiffs

would not have been prescribed the subject drug, Vioxx, by his physician, if the physician

had not been given wrongful and incorrect information by the defendants including the

Sales Representative defendants.

117.    If defendants had not engaged in this conduct, consumers, such as the

Plaintiffs, would have switched from Vioxx to safer products or refrained wholly from its

efficacy.

118.    From approximately 1999 through the date of Plaintiffs injuries defendants

engaged in a scheme of marketing, distributing and/or selling Vioxx under the guise that

it was safe and efficacious for persons such as the Plaintiffs.

119.    Plaintiffs allege that the marketing strategies, including without limitation the

detail and sampling programs and direct-to-consumer advertising, used by Merck, targeted

consumers like the Plaintiffs to induce them to purchase and use Vioxx. defendants

distributed, manufactured and marketed Vioxx, in a manner designed to convince and their

physicians to rely on the marketing, advertisements and product information propounded

by defendant.

120.    On September 30, 2004, Merck voluntarily removed Vioxx from all markets

in the United States.

121.    The sales representative defendants negligently, recklessly, intentionally and

fraudulently made material representations that Vioxx was safe and effective. The sales

representative defendants represented Vioxx as safe so that the general consuming public, including Plaintiffs and their physicians, would rely upon said representations when purchasing the product. The sales representative defendants also suppressed the cardiovascular risks from prescribing physicians, and consumers such as the Plaintiffs, even though they had knowledge of the risks.

122.    Merck trained its sales representatives, through programs such as the "Vioxx Obstacle Dodge Ball Program," the "Obstacle Response Guide for Vioxx," and "Top Ten Obstacle Handlers" to misstate, conceal, and misrepresent the truly dangerous nature of Vioxx to prescribing physicians. The sales representative defendants applied, utilized and put into practice each of these programs with the doctors in question.

123.    These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the safety of Vioxx.

124.    These programs were specifically designed and promulgated by Merck to mislead prescribing physicians about the life threatening side effects, including myocardial infarction and stroke, of Vioxx.

125.    Merck trained its sales representative force, including the sales representative defendants, to utilize its "Dodge Ball" and "Obstacle Avoidance" programs during the sales representatives' interactions with or "calls" upon prescribing physicians, and defendants put them into full effect with the subject doctors.

126.    These programs were utilized by sales representatives, including the sales representative defendants to "dodge" relevant safety questions by physicians to who promoted and or sold Vioxx. Indeed, these programs provide specific responses and representations that are to be made by Merck sales representatives to physicians during the sales calls or in response to physician questions. These Merck mandated responses

misrepresented the safety of Vioxx.

127.    The Vioxx Obstacle Dodge Ball Program identifies and categorizes physician safety questions as "obstacles" to Merck's sales force. The "Dodge Ball" program specifically instructs sales representatives, including the sales representative defendants, to "dodge" these physicians' safety related questions/obstacles. Indeed, the last few pages of the "Dodge Ball" instruction manual simply state "DODGE," "DODGE," and "DODGE." The safety questions to be "dodged" by sales representatives, including the sales representative defendants, include, inter alia, questions such as, "I am concerned about the cardiovascular effects of Vioxx," and "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex."

128.    Additional sales representative guidelines provide specific answers to physician questions/obstacles (such as those noted above) that were to be recited by sales representatives, including the sales representative defendants. The top three "obstacles" listed on the sales guidelines are physician safety questions involving Vioxx related "Cardiovascular Events." Sales representative, including the sales representative defendants, are thereafter provided with specific misrepresentations to make to the concerned physicians about the safety of Vioxx. For example, bulletins from Merck to its sales representatives state, "in response to recent published reports about Vioxx on May 1, 2000, we provided you with an approved verbal response to use to address customers' questions around the incidence rate of MI's [myocardial infarctions] on patients taking Vioxx..." (Bulletin for Vioxx: New PIRs Relative to Vioxx GI Outcomes Research Study). Sales representatives, including the sales representative defendants, were therefore required to misrepresent that Vioxx does not increase the rate of myocardial infarctions when compared with NSAID's. This misrepresentation is false and inaccurate, yet was

intentionally, knowingly, recklessly, wantonly and/or negligently made to treating physicians, including each Plaintiffs' prescribing physicians, by the individually named sales representatives. In an instructional video used to train sales representatives, an actress playing "an obstacle" to Vioxx sales says, "I'm afraid Vioxx causes M.I.'s" - a reference to myocardial infarctions, or heart attacks. In response, an actress playing a Merck sales representative says, "That's not true." This was wrong, Vioxx causes M.I.'s. The mechanism of Vioxx-induced heart attack and stroke is the same – vasoconstriction and blood-clot creation.

129.  Merck's sales representatives, specifically the sales representative defendants, utilized the misrepresentations contained in the obstacle avoidance programs to mislead each Plaintiffs' treating physicians concerning the safety of Vioxx and the occurrence of life threatening side effects, such as strokes and myocardial infarctions, from the usage of Vioxx.

130.  Merck and the individually named sales representatives further misrepresented the safety of Vioxx to prescribing physicians by providing written literature to the doctors that contained false statements about Vioxx's safety. Such literature would be forwarded to the physician who posed questions/obstacles to the sales representatives after the sales representatives had concluded their meeting with the physician, entitled "In Response To Your Questions" (follow-up literature that misrepresents Vioxx's cardiovascular safety) and "In Response To Your Questions: Cardiovascular System", which also misrepresents the risks associated with Vioxx.

131.  Sales representatives, including the sales representative defendants, were also ordered to send follow-up letters to physicians with whom they met who had posed questions/obstacles. These letters would downplay the cardiovascular risks associated with

Vioxx, even though the defendants were well aware that the risks existed.

132.    The underlying inducement for both Merck and its sales representatives, including the sales representative defendants, to make repeated misrepresentations to physicians about the safety of Vioxx was money. The more doctors prescribed Vioxx, the more money Merck made. The more doctors the sales representatives, including the sales representative defendants, cajoled into prescribing Vioxx, the more money and non-monetary bonuses the sales representatives received. Thus, sales representatives, such as the sales representative defendants, had a financial interest in disseminating the false and misleading information, while concealing the known risks (i.e., obstacle responses) outlined above to as many prescribing physicians as possible, including Plaintiffs' prescribing physicians

133.    Plaintiffs and their prescribing physicians reasonably relied, to their detriment, upon the false oral and written misrepresentations of Merck, and the sales representative defendants, concerning the safety of Vioxx and the absence of adverse cardiovascular events in users. Such reasonable reliance induced each Plaintiff's treating physician to prescribe his Vioxx and further induced the Plaintiffs to utilize the dangerous drug Vioxx. As a direct and proximate result of Plaintiff's usage of Vioxx, they were injured as described herein. Such event has caused Plaintiff's great pain and suffering, mental anguish, expense.

134.    On June 23, 2005 conduct of Merck and its sales representatives was summarized in the New England Journal of Medicine as follows:

"The pharmaceutical industry spends more than $5.5 billion to promote drugs to doctors each year — more than what all U.S. medical schools spend to educate medical students. Major drug companies employ about 90,000

sales representatives — one for every 4.7 doctors in the United States, according to the American Medical Association. Although substantial marketing expenditures are common in many industries, the potential effect of drug marketing on health raises special concerns. For years, the industry has justified these expenditures on the grounds that they fund essential education for doctors. According to the Web site of the Pharmaceutical Manufacturers and Research Association, "many physicians learn about new drugs - indeed, about ongoing research in their areas of specialization - largely through information provided by the companies that market new products." But if the primary goal is sales, not education, and the information provided to physicians is slanted or misleading, the health consequences for patients can be serious.

"Because of the recent events surrounding Rofecoxib, the May 5 hearing of the Government Reform Committee focused on Merck, the manufacturer of Vioxx... Merck cooperated voluntarily with our request for information, providing more than 20,000 pages of internal company documents. Merck also voluntarily sent a senior executive to testify at the hearing and answer the committee's questions. Yet as we learned, even a company like Merck can direct its sales force to provide clinicians with a distorted picture of the relevant scientific evidence.

"On February 7, 2001, the Arthritis Drugs Advisory Committee of the Food and Drug Administration (FDA) met to discuss the VIGOR study. At this meeting, Merck argued that the significant increase in the rate of myocardial infarction (which further analysis had determined to be a fivefold increase) was explained by a protective effect of naproxen, not by any inherent risk posed by its drug. After the FDA's medical reviewer and others expressed concern about

this explanation, the advisory committee voted unanimously that physicians should be made aware of VIGOR's cardiovascular results.

"The next day, Merck sent a bulletin to its Rofecoxib sales force of more than 3000 representatives. The bulletin ordered, "DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE . . . OR THE RESULTS OF THE . . . VIGOR STUDY." It advised that if a physician inquired about VIGOR, the sales representative should indicate that the study showed a gastrointestinal benefit and then say, "I cannot discuss the study with you."

"Merck further instructed its representatives to show those doctors who asked whether Rofecoxib caused myocardial infarction a pamphlet called "The Cardiovascular Card." This pamphlet, prepared by Merck's marketing department, indicated that Rofecoxib was associated with 1/8 the mortality from cardiovascular causes of that found with other anti-inflammatory drugs. Stroke is caused by Vioxx with the same mechanism as myocardial infarction.

"The Cardiovascular Card provided a misleading picture of the evidence on Rofecoxib. The card did not include any data from the VIGOR study. Instead, it presented a pooled analysis of preapproval studies, in most of which low doses of Rofecoxib were used for a short time. None of these studies were designed to assess cardiovascular safety, and none included adjudication of cardiovascular events. In fact, FDA experts had publicly expressed "serious concerns" to the agency's advisory committee about using the preapproval studies as evidence of the drug's cardiovascular safety.

"Persistent physicians who sought additional information about the

cardiovascular effects of Rofecoxib were directed to send inquiries to the company's headquarters. Merck's response to these physicians highlighted the misleading information from the Cardiovascular Card.

"Beyond these specific communications to physicians, our committee also heard evidence of a broad disparity between the evidence-based perspective provided by scientific journals and expert committees, on the one hand, and the sales pitch used by the company's field staff, on the other. Merck instructed its sales representatives, for example, to provide only certain approved study results to doctors. Approved scientific studies were defined as those that provide "solid evidence as to why [doctors] should prescribe Merck products for their appropriate patients." By contrast, those studies that raised safety questions about drugs were considered background studies. Distributing the results of a background study was "a clear violation of Company Policy."

"Merck also trained its representatives to identify speakers for educational events who were "opinion leaders" who could provide "favorable" views of the company's products to other doctors. Underlining the promotional nature of these events, Merck instructed its sales representatives to track whether the physicians who attended them subsequently prescribed more Merck drugs.

"In addition to providing selective evidence and biased presentations, Merck counseled its representatives to use an array of subliminal selling techniques to affect prescribing - potentially undermining the ability of physicians to choose drugs strictly on the basis of the risks, benefits, and costs for a particular patient. For example, in a training course on selling skills,

Merck taught representatives to mimic the words and body language of doctors during sales calls. The curriculum explained that 'mirroring is the matching of patterns, verbal and non-verbal, with the intention of helping you enter the customer's world. It is positioning yourself to match the person talking. It subconsciously raises his/her level of trust by building a bridge of similarity.'"

135.   The sales representative defendants personally performed the acts and omissions described herein and participated in the torts alleged herein. The sales representative defendants had knowledge of the cardiovascular risks associated with Vioxx, and misrepresented and/or concealed the nature of these risks to the opinion leaders in the local medical community, to the public, Plaintiffs, and to Plaintiff's physicians. The sales representative defendants were not acting as mere conduits, because they had knowledge that the information conveyed to each opinion leader, consumer, the public and to each of Plaintiffs' physicians, was false.

136.   Accordingly, the sales representative defendants are liable to Plaintiffs for the claims stated herein, and are fully responsible for their own personal acts and omissions whether performed for Merck or as a "frolic of their own" or otherwise. They acted for their own personal profit and "following orders" is not a defense where they acted personally in a negligent, wanton and deceitful manner.

137.   As a result of the misrepresentations, deceit, and suppression by the defendants as set forth previously in this Complaint and as set forth below, these parties, and Plaintiffs were deceived and defrauded, and as a direct and proximate result of the said deceit, fraud, misrepresentation, and fraudulent suppression the Plaintiffs suffered the harm and injury as set forth in this Complaint. The conduct of the defendants described in

46

all counts of this civil action is gross, oppressive, burdensome, willful, intentional, wanton and otherwise such as to justify the imposition of punitive damages under Alabama law.

**WHEREFORE**, Plaintiffs demand judgment against Merck & Co., Inc., Merck Corporation, Merck Pharmaceutical Division, David Sparkman, Natasha Walker-McGlothan, Katherine Holmes, Lori Lovett, Scott Bartlett, Coral Harper, Melissa Santiago, Henry Mitcham, Jerry Pharr, Jason Delk, Charles Henderson, James Houston, Julie Melton, Julie Hodges, Natasha Walker-McGlothan, Randy Walls, Melissa Bauer and defendants A, B, C, D, E, F, X and Z, whose true names are unknown to the Plaintiffs but will be added by amendment when correctly ascertained, jointly and severally in such sums of compensatory and punitive damages as the jury determines to be fair, just, and lawful plus costs of Court.


James S. Hubbard
Attorney for Plaintiffs


Thomas J. Knight
Attorney for Plaintiffs


HUBBARD & KNIGHT
Post Office Drawer 1850
Anniston, Alabama 36202
(256) 237-9586

47

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT – CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number<br>C V 2006 145 - [ ]<br>Date of Filing:<br>04 21 2006<br>Month  Day  Year | Judge Code:<br>[ ][ ][ ][ ] |

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF _____ RANDOLPH COUNTY _____, ALABAMA
*(Name of County)*

CLIFFORD BAILEY, et., als.          v.          MERCK & CO., INC., et. als.

**Plaintiff**                                          **Defendant**
First Plaintiff   ☐ Business   ☑ Individual       First Defendant   ☑ Business   ☐ Individual
                  ☐ Government ☐ Other                                ☐ Government ☐ Other

---

**NATURE OF SUIT:**  Select primary cause of action, by checking box (check only one) the best characterizes your action:

| TORTS: PERSONAL INJURY | OTHER CIVIL FILINGS (cont'd) |
|---|---|
| ☐ WDEA  - Wrongful Death | ☐ MSXX  - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve |
| ☐ TONG  - Negligence: General | ☐ CVRT  - Civil Rights |
| ☐ TOMV  - Negligence: Motor Vehicle | ☐ COND  - Condemnation/Eminent Domain/Right-of-Way |
| ☐ TOWA  - Wantonness | ☐ CTMP  - Contempt of Court |
| ☐ TOPL  - Product Liability/AEMLD | ☐ CONT  - Contract/Ejectment/Writ of Seizure |
| ☐ TOMM  - Malpractice-Medical | ☐ TOCN  - Conversion |
| ☐ TOLM  - Malpractice-Legal | ☐ EQND  - Equity Non-Damages Actions/Declaratory Judgment/Injunction<br>Election Contest/Quiet Title/Sale For Division |
| ☐ TOOM  - Malpractice-Other | ☐ CVUD  - Eviction Appeal/Unlawful Detainer |
| ☑ TBFM  - Fraud/Bad Faith/Misrepresentation | ☐ FORJ  - Foreign Judgment |
| ☐ TOXX  - Other: _____ | ☐ FORF  - Fruits of Crime Forfeiture |
| | ☐ MSHC  - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition |
| **TORTS: PERSONAL INJURY** | ☐ PFAB  - Protection From Abuse |
| ☐ TOPE  - Personal Property | ☐ FELA  - Railroad/Seaman (FELA) |
| ☐ TORE  - Real Property | ☐ RPRO  - Real Property |
| | ☐ WTEG  - Will/Trust/Estate/Guardianship/Conservatorship |
| **OTHER CIVIL FILINGS** | ☐ COMP  - Workers' Compensation |
| ☐ ABAN  - Abandoned Automobile | ☐ CVXX  - Miscellaneous Circuit Civil Case |
| ☐ ACCT  - Account & Nonmortgage | |
| ☐ APAA  - Administrative Agency Appeal | |
| ☐ ADPA  - Administrative Procedure Act | |
| ☐ ANPS  - Adults in Need of Protective Services | |

---

**ORIGIN** *(check one):*   F ☑ INITIAL FILING        A ☐ APPEAL FROM        O ☐ OTHER:
                                                       DISTRICT COURT        _____

R ☐ REMANDED        T ☐ TRANSFERRED FROM
                        OTHER CIRCUIT COURT

---

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ YES  ☑ NO    Note: Checking "Yes" does not constitute a demand for a
jury trial. (See Rules 38 and 39, Ala.R.Civ.P., for procedure)

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED      ☐ NO MONETARY AWARD REQUESTED

ATTORNEY CODE:   K N I 0 0 9        4 21 06
                                    Date              Signature of Attorney/Party filing this form

---

**MEDIATION REQUESTED:**   ☐ YES  ☐ NO  ☑ UNDECIDED

## Filed in Office

SEP 2 1 2006

KIM S. BENEFIELD
Clerk of Circuit Court

## IN THE CIRCUIT COURT OF RANDOLPH COUNTY, ALABAMA

| | |
|---|---|
| **PHILLIP THOMPSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NUMBER: CV-2007-000119** |
| | ) |
| **MERCK & CO., INC., a foreign or** | ) |
| **Domestic Corporation, DAVID SPARKMAN,** | ) |
| **KATHERINE HOLMES, LORI LOVETT,** | ) |
| **SCOTT BARTLETT, CORAL HARPER,** | ) |
| **MELISSA SANTIAGO, HENRY MITCHAM,** | ) |
| **JERRY PHARR, JASON DELK, CHARLES** | ) |
| **HENDERSON, JAMES HOUSTON, JULIE** | ) |
| **MELTON, JULIE HODGES, MELISSA** | ) |
| **BAUER, NATASHA** | ) |
| **WALKER-MCGLOTHAM,** | ) |
| **RANDY WELLS, and the Defendants A,** | ) |
| **B, C, D, E, X & Z whether singular or** | ) |
| **plural, being those persons, firms or** | ) |
| **entities who or which proximately** | ) |
| **caused or contributed to the Plaintiff's** | ) |
| **and Plaintiff's decedent's other harm** | ) |
| **and the other damages as complained** | ) |
| **of herein whose true names are** | ) |
| **unknown to the Plaintiff but will be** | ) |
| **added by amendment when correctly** | ) |
| **ascertained,** | ) |
| | ) |
| **Defendants.** | |

## NOTICE OF FILING NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Merck & Co., Inc. has this date filed its Notice of

Removal in the Office of the Clerk of the United States District Court for the Middle District of

Alabama a copy of which is attached hereto as **Exhibit A.**

BEN C. WILSON
Bar No.: asb-1649-i54b
One of the Attorneys for Defendant,
Merck & Co., Inc.

Bluumberg No. 5118

EXHIBIT

H.

OF COUNSEL:
Robert C. "Mike" Brock
F. Chadwick Morriss
Ben C. Wilson
RUSHTON, STAKELY, JOHNSTON, & GARRETT, P.A.
Post Office Box 270
Montgomery, Alabama 36101-0270
Telephone:  (334) 206-3100
Facsimile: (334) 262-6277
rcb@rsjg.com
fcm@rsjg.com
bcw@rsjg.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served the above and foregoing document upon all interested parties by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this the 13th day of September 2007, as follows:

Thomas J. Knight
HUBBARD & KNIGHT
P.O. Drawer 1850
1125 Noble Street
Anniston, Alabama  36202

Steven R. Morris
P.O. Box 814
Wedowee, Alabama 36278-0814

OF COUNSEL

## JURY AWARDS IN AEMLD CASES

| | |
|---|---|
| $950,000 | Castleberry v. Cantrell Mach. Co., 2004 WL 3201180 (Ala. Cir. Ct., Blount County, Sept. 2, 2004) (products liability action by a woman whose hand was injured by a chicken heart and liver harvesting machine) |
| $50,000,000 (Original Verdict) | Mack Trucks, Inc. v. Witherspoon, 867 So. 2d 397 (Ala. 2003) (products liability case arising out of a tractor-trailer rollover) |
| $12,000,000 ($6,000,000 Compensatory, $6,000,000 Punitive) | Morgan v. ProTech Industries, 2003 WL 23111876 (Ala. Cir. Ct., Lamar County, Aug. 29, 2003) (wrongful death case based on products liability claim against truck manufacturer arising out of rollover and absence of cab guard on logging truck) |
| $7,000,000 | Daniel v. Snap Products, 2003 WL 23111815 (Ala. Cir. Ct., Baldwin County, May 28, 2003) (wrongful death case based on products liability claim against manufacture of tire repair product after treated tire exploded) |
| $4,168,500 ($1,068,500 Compensatory, $3,100,000 Punitive) | McClain, et al. v. Metabolife Int'l., Inc., 259 F. Supp. 2d 1225 (N.D. Ala. 2002) (products liability action by four plaintiffs who suffered cardiac symptoms after using ephedra-based diet drug) (reversed on appeal, 401 F.3d 1233 (11th Cir. 2005), and remanded for a new trail) |
| $960,000 ($25,000 over and above $935,000 in pro tanto settlements) | Hannah v. Gregg Bland & Berry, 2002 WL 32169263 (Ala. Cir. Ct., Colbert County, Oct. 25, 2002) (wrongful death case arising out of fatal crush injury in industrial belt equipment) |
| $122,600,000 ($22,600,000 Compensatory, $100,000,000 Punitive) | Jernigan v. General Motors Corp., Bullock County (May 3, 2002) (products liability case arising out of collapse of Oldsmobile passenger compartment) (reversed on appeal, 883 So.2d 646 (Ala. 2003), and remanded for new trial) |
| $510,000 (Compensatory) $10,000,000 (Punitive) | Hobart Corporation v. Scottie W. Scoggins, 776 So.2d 56 (Ala. 2000) (products liability action by a man who was injured while using a meat saw manufactured by Hobart) |
| $3,000,000 ($2,500,000 Compensatory $500,000 Punitive) | Cessna Aircraft Company v. Robert Trzcinski, 682 So. 2d 17 (Ala. 1996) (products liability action by a man who was injured in an airplane crash due to a defective shoulder harness) |
| $1,000,000 (Original verdict $825,000) | Uniroyal Goodrich Tire Company v. Jackie Darryl Hall, 681 So. 2d 126 (Ala. 1996) (products liability action by a man who was injured when wheel rim exploded) |
| $1,225,000 | Ford Motor Company v. Jana Burdeshaw, 661 So. 2d 236 (Ala. 1995) (wrongful death case brought against truck manufacturer after decedent was killed by a truck's transmission slipping out of neutral and crushing him) |

1A3285121                                    1

Blumberg No. 5118

EXHIBIT

I.

| | |
|---|---|
| $13,000,000 | *General Motors Corporation v. Pamela L. Saint*, 646 So. 2d 564 (Ala. 1994) (products liability action by a woman who was injured due to a defective seat belt) |
| $250,000 ($100,000 Compensatory, $150,000 Punitive) | *Mazetis Enterprises, Inc. v. Maureen Davis*, 709 So. 2d 1132 (Ala. 1998) (products liability action by a woman who found human blood in styrofoam package containing biscuit gravy) |
| $250,000 | *Caterpillar, Inc. v. Hightower*, 605 So. 2d 1193 (Ala. 1992) (product liability action brought by a man who was injured by a broken tree trunk while handling machinery during logging operation) |
| $115,000 | *Banner Welders, Inc. v. Knighton*, 425 So. 2d 441 (Ala. 1982) (product liability claim against manufacturer for personal injuries received on shuttle welder) |
| $6,500,000 | *Sears, Roebuck & Co. v. Harris*, 630 So. 2d 1018 (Ala. 1993) (wrongful death case based on product liability claims against manufacturer and retailer of gas water heater that caused carbon monoxide poisoning) |
| $7,500,000 | *General Motors Corp. v. Johnson*, 592 So. 2d 1054 (Ala. 1992) (wrongful death case based on product liability claim where child was killed in automobile accident) |
| $5,000,000 | *Industrial Chem. & Fiberglass Corp. v. Chandler*, 547 So. 2d 812 (Ala. 1989) (widows of two workers killed in industrial accident brought wrongful death action against distributor of cleaning substances that ignited and caused death of workers) |
| $2,800,000 | *General Motors Corp. v. Edwards*, 428 So. 2d 1175 (Ala. 1985) (wrongful death case based on products liability claim where two boys were killed in automobile accident) |
| $200,000 | *Interstate Engineering, Inc. v. Burnett*, 474 So. 2d 624 (Ala. 1985) (wrongful death case brought against manufacturer of heat detectors after decedent was killed in a fire) |
| $800,000 | *Piper Aircraft Corp. v. Evans*, 424 So. 2d 586 (Ala. 1982) (damages in wrongful death case based on product liability claims against airplane manufacturer where decedent was killed in plane crash) |
| $500,000 | *Caterpillar Tractor Co. v. Ford*, 406 So. 2d 854 (Ala. 1981) (wrongful death case based on product liability claims where decedent was killed in an accident on a tractor manufactured by defendant) |



# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: BAYCOL PRODUCTS LITIGATION

MDL No. 1431
(MJD)

This Document also relates to:

| | |
|---|---|
| Annie Andrews et al. v. Bayer Corp. et al , | Case No. 03-4932 |
| Maney Anglin et al. v. Bayer Corp. et al., | Case No 03-4942 |
| Judy Baldwin et al. v. Bayer Corp. et al., | Case No. 03-4930 |
| Dorothy Bennett et al v. Bayer Corp. et al, | Case No 03-4938 |
| Alice Dowling et al. v. Bayer Corp et al , | Case No. 03-4931 |
| Mary Ellis et al. v. Bayer Corp. et al., | Case No, 03-4933 |
| Sis Grubbs et al. v. Bayer Corp. et al , | Case No 03-4934 |
| George Jenkins et al. v. Bayer Corp et al., | Case No 03-4943 |
| Mary Richardson et al. v. Bayer Corp. et al, | Case No 03-4935 |
| Charles Rogers et al. v. Bayer Corp. et al , | Case No. 03-4936 |
| Clarence Wheeler et al v. Bayer Corp. et al , | Case No. 03-4941 |
| Albert Williams et al. v. Bayer Corp. et al , | Case No 03-4937 |
| Willie Womack et al v. Bayer Corp. et al , | Case No 03-4939 |
| Jeffrey Woods et al v. Bayer Corp et al., | Case No 03-4940 |

Andy D. Birchfield, Jr., E. Frank Woodson, and Melissa A. Prickett, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. for and on behalf of Plaintiffs.

Peter W. Sipkins, Dorsey & Whitney LLP for and on behalf of Bayer Corporation

Scott A. Smith and Tracy J. Van Steenburgh for and on behalf of SmithKline Beecham Corporation d/b/a GlaxoSmithKline.

This matter is before the Court upon Plaintiffs' motions for remand. Bayer Corporation ("Bayer") and SmithKline Beecham Corporation d/b/a

1



EXHIBIT

J.



GlaxoSmithKline ("GSK") oppose the motions, arguing that this Court has diversity jurisdiction over Plaintiffs' claims.

Background

    The above-referenced cases were originally filed in Alabama state court and involve a number of plaintiffs that are citizens of Alabama. Plaintiffs each allege that they were prescribed Baycol and that as a direct and proximate result of taking Baycol, each Plaintiff was caused to suffer physical injury.[1] In their Complaints, the Plaintiffs assert the following claims against Bayer A G , Bayer Corporation, GSK, as well as against Monica Reid and Jerry Totty, district managers for GSK and Todd Trawick and Donald Heller, sales representatives for GSK: the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"); negligence; breach of warranty; and; fraud/suppression.

    Bayer and GSK removed the above actions to federal court on the basis that the non-diverse defendants, the individual district managers and sales representatives, were fraudulently joined. Plaintiffs now seek remand, arguing that they have stated a claim against these individual defendants.

Standard

    Remand to state court is proper if the district court lacks subject matter

---

[1] With the exception of those paragraphs describing the claims of the individual plaintiffs, the allegations against the defendants in all of the above referenced complaints are identical. For ease of reference, the Court will refer only to the Baldwin Complaint.

2



jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). In reviewing a motion to remand, the court must resolve all doubts in favor of remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. In re Business Men's Assurance Co. of America, 992 F.2d 181, 183 (8th Cir. 1993) (citing Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3rd Cir. 1987) cert. dismissed 484 U.S. 1021 (1988))

Fraudulently joined defendants will not defeat diversity jurisdiction. Filla v. Norfolk Southern Railway Company, 336 F.3d 806, 809 (8th Cir. 2003) "Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendants." Wiles v. Capitol Indemnity Corporation, 280 F.3d 868, 870 (8th Cir. 2001) The burden is on the removing party to show that a non-diverse party has been fraudulently joined. Id., at 871. In deciding this issue, the Court may consider the pleadings and supporting affidavits. Parnas v. General Motors Corporation, 879 F Supp 91, 92 (E.D. Mo 1995)

1. AEMLD Claim

Plaintiffs have alleged AEMLD claims against all defendants. To establish liability under AEMLD, the plaintiffs must show they were injured by one who sold a product in a defective condition unreasonably dangerous to the plaintiffs as

3



the ultimate user or consumer; the seller was engaged in the business of selling such a product; the product was expected to and did reach the users without substantial change in the condition in which it was sold. Carter v. Cantrell Machine Company, Inc., 662 So. 2d 891, 892 (Ala. 1995).

Defendants argue that the district managers and sales representatives are not "sellers" of BayCol, as contemplated by the AEMLD. The Court agrees. The purpose of the AEMLD, a judicially created doctrine, is to "plac[e] the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of those products." Atkins v. American Motors Corp. et al., 335 So.2d 134, 139 (Ala. 1976). Although no Alabama state court decision specifically addresses whether a district manager or sales manager could be held liable under the AEMLD, other courts have found that Alabama would not impose such liability. For example, in an unpublished opinion from the Southern District of Alabama, the district court specifically held that a sales manager cannot be held liable under the AEMLD. Bowman v. Coleman Company, Inc., Civil Action No. 96-0448-P-C (S.D.Ala. 1996), Attached as Ex. B. to Removal Petition. The court recognized that the defendant sales manager "had no authority to compel or prevent the distribution of particular products . . . for such product distribution decisions are vested in the [] home office, rather than in its individual store managers." Id. at *7. The court also noted that it is the corporation that reaps the

4



profits from the distribution from products, and has the participatory market connection with the manufacturer through which the corporation can recoup costs as a result of seller liability, not the sales manager. Id. "In short the policy goals underlying the AEMLD would not be advanced in any way by holding persons such as Mr. Elkins liable in their role as store managers or sales representatives."

In another MDL proceeding, the district court similarly held that Alabama courts would not hold a sales representative liable under AEMLD. In re Rezulin Products Liability Litigation, 133 F.Supp. 2d 272, 287-288 (S D N Y  2001).

> The sales representative joined in the Alabama case neither manufactured, sold nor supplied Rezulin   Rather, he was an agent of the manufacturer and seller.  As a corporate employee, he was not 'the one best able' to prevent sales of defective drugs.  In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representatives in this case.

Id.  See also, Wakeland v. Brown & Williamson Tobacco Corporation, 996 F.Supp. 1213 (S.D. Ala  1998) (finding that retailer of cigarettes was fraudulently joined as plaintiffs had failed to state a claim under AEMLD, in part, because Alabama rejects the no fault precept and plaintiff failed to demonstrate a causal connection between the retailer's activities in connection with the handling of the product and the product's defective condition).

Plaintiffs do not allege, and nothing in the records supports a finding, that



the individual defendants are "sellers" as that term is used to impose liability for a defective product. In fact, the individual defendants submitted declarations in which they attest that they are not sellers, manufacturers, developers or testers of Baycol. Declarations of Monica Reid, Jerry Totty, Todd Trawick and Donald Heller, Ex. C to Joint Notice of Removal. Accordingly, the Court finds that Alabama would not recognize an AEMLD claim against the individual defendants in these cases.

2. Negligence/Warranty Claim

Plaintiffs also assert negligence and warranty claims against the individual defendants, alleging they were negligent in the design, manufacture, development, packaging, labeling, marketing, promoting, advertising and sale and/or distribution of Baycol and provided express and implied warranties concerning Baycol's safety and efficacy. Compl. ¶¶ 28-32. Defendants argue that these claims fail as well, as such claims can only be brought against a manufacturer or seller of an allegedly defective product.

In support of remand in these cases, Plaintiffs argue that the negligence and warranty claims stand, as such claims are not subsumed by AEMLD. Defendants do not argue to the contrary, and the Alabama Supreme Court has found that negligence claims are not subsumed by AEMLD. Tillman v. R.J. Reynolds Tobacco Co., 2003 WL 21489707 (Ala. 2003). However, none of the

6



cases cited in their briefs addresses the propriety of such claims against individuals that were not manufacturers or sellers of the product at issue.

Alabama law provides that claims of negligent manufacture or sale may only be asserted against the manufacturer or seller. Norton Co. v. Harrelson, 176 So 2d 18, 20 (Ala. 1965). Similarly, claims of breach of express or implied warranties may only be asserted against the seller of the product at issue. See e.g. Rutledge v. Arrow Aluminum Industries, Inc., 733 So 2d 412, 417 (Ala. Civ. App. 1998) (plaintiff cannot recover against construction company under AEMLD or breach of warranty when no evidence presented that construction company sold the alleged defective product at issue). See also, Ala. Code § 7-2-313(1) ("Express warranties by the seller are created as follows     "); id. § 7-2-314(1) (implied warranty of merchantability applies to a seller that is a "merchant with respect to goods of that kind"); id. § 7-2-315(1) (implied warranty; fitness for a particular purpose applies to sellers).

As the individual defendants are not sellers or manufacturers of Baycol, rather they are only agents of the seller of Baycol, Plaintiffs' negligence and warranties claims against the individual defendants would fail.

3. Fraud/Suppression

Finally, Plaintiffs allege that the individual sales manager and sales representative defendants made knowing fraudulent misrepresentations that

7



Baycol was safe with the intent to induce physicians to prescribe Baycol and that plaintiffs were injured as a result. Compl. ¶¶ 43 and 44.  Defendants argue these allegations do not meet the specificity requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Alabama Rules of Civil Procedure, and that such claims should therefore be dismissed

Alabama law clearly provides that a claim for fraud must be plead with

particularity.

Rule 9(b), A.R.Civ.P. provides that when fraud is alleged, the circumstances constituting the fraud must be stated with particularity. This does not mean that every element must be pleaded with particularity. The pleader, however, must use more than generalized or conclusionary statements when setting out the allegations of fraud. The pleader must state the place, the time, the contents of the false misrepresentations, the fact misrepresented, and an identification of what has been obtained. Robinson v. Allstate Ins. Co., 399 So.2d 288 (Ala 1981). The purpose of Rule 9(b) is to provide adequate notice to the opposing party of any claim for fraud so that he may properly prepare his case. Caron v. Teagle, 345 So.2d 1331 (Ala 1977).

Lyda v. United Ins. Co. of America, 628 So.2d 665, 670 (Ala Civ App 1993)

In reviewing the Complaints at issue here, the Court finds that Plaintiffs have failed to plead, with the requisite particularity, the "place, the time, the contents of the false misrepresentations, the fact misrepresented, and the identification of what has been obtained." Id. Rather, the allegations supporting the fraud/suppression claim are general and conclusory.  For example, one such allegation reads "the District Managers and Sales Representatives advertised,

8



marketed, and/or promoted Baycol to prescribing physicians utilizing information known to fraudulently represent the safety and efficacy of Baycol, and the District Managers and Sales Representatives failed to warn of the known dangers and adverse events associated with the use of Baycol." Baldwin Compl. ¶ 17. Another reads "the District Managers and Sales Representatives called on physicians . . . at which times they presented fraudulent information . . . " Id. ¶ 14. No allegation specifies the specific misrepresentation the individual defendants made, to whom and under what circumstances

### 4   Amount in Controversy

In the Baldwin Complaint, Plaintiff Ruby Johnson alleges she suffered physical and/or mental injuries in the aggregate amount of $74,000. Baldwin Comp. ¶ 6   Plaintiffs in the Baldwin action thus argue that the remand is appropriate as the amount in controversy is not met   Defendants respond that plaintiff Johnson has failed to limit her damages below the jurisdictional amount:

The Court begins its analysis with the principle that the amount claimed by Plaintiffs ordinarily controls in determining whether jurisdiction lies in federal court. Zunamon v. Brown, 418 F.2d 883, 885 (8th Cir. 1969) (citing St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288-289 (1938)). Nonetheless, "the plaintiffs allegations of requisite jurisdictional amount are not necessarily dispositive of the issue" Id.   That is because an allegation in a

9



pleading is not binding. The applicable rules of civil procedure liberally allow the amendment of pleadings. Thus, to prevent removal, a plaintiff must submit a binding stipulation or affidavit, separate from the pleadings, and signed by the plaintiffs agreeing to be so bound. See eg. De Aguilar, 47 F.3d at 1412; In re Shell Oil Co., 970 F.2d 355, 356 (7th Cir. 1992); White v. Bank of America, 2001 WL 804517 (N.D. Tex. 2001) (to prevent removal, plaintiff must file with the complaint a binding stipulation or affidavit that limits the scope of their recovery).

The Court finds that based on all claims included in the Complaint, the amount in controversy exceeds $75,000. Specifically, all of the Baldwin plaintiffs have asserted a number of claims arising in tort, contract and statute. Plaintiffs also seek compensatory and punitive damages. Given the breadth of their requests, the amount in controversy easily exceeds $75,000 per plaintiff, including plaintiff Johnson.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motions for remand are DENIED.

Date: March 25, 2004

/s/ Michael J. Davis
Michael J. Davis
United States District Court

10

FILED

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 JUN 24  PH 3: 06

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARGIE REAVES FOWLER, et al,          )
                                      )
        Plaintiffs,                   )
                                      )
                                      )
v.                                    )       Civil Action No.: CV-04-PT-712-M
                                      )
PHARMACIA and UPJOHN COMPANY,         )
MCKESSON CORPORATION,                 )
CHARLIE WATSON, et al,                )
                                      )

ENTERED
JUN 24 2004

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant Charlie Watson's ("Watson") motion to

dismiss, filed on April 7, 2004, and plaintiffs Margie Reaves Fowler's ("Mrs. Fowler") and Mark

Fowler's ("Mr. Fowler") motion to remand, filed on May 7, 2004.

**FACTS[1] AND PROCEDURAL HISTORY**

Plaintiff Margie Reaves Fowler ("Fowler") is an adult resident of St. Clair County, Alabama.

Plaintiff Mark Fowler is her husband. Defendants Pharmacia & Upjohn Company ("P&U Co.") and

McKesson Corporation ("McKesson") are corporations doing business in Alabama. Defendant

Watson, an employee of McKesson,[2] allegedly "sold and/or distributed" the drug at issue.

---

[1] The "facts" are as alleged in the complaint.

[2] The complaint, this court notes, does not allege McKesson Corporation's specific role
regarding Depo-Provera (also known as medroxyprogesterone). However, defendant Watson's
affidavit attached to the notice of removal stated: "My employer, McKesson Medical-Surgical,
did not manufacture Depo-Provera Contraceptive Injection. McKesson Medical Surgical was
only a distributor of Depo-Provera . . . ."

1



EXHIBIT

K.

31

Mrs. Fowler was prescribed and received injections of Depo Provera[3] from June 1999 through December 2001. The injections were given by a licensed health care provider in a clinical setting. Depo Provera was allegedly "manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, prescribed, administered and otherwise distributed by the Defendants herein." *See* Compl. ¶ 7. On February 28, 2002, Mrs. Fowler suffered a stroke, which according to plaintiffs, was proximately caused by Depo Provera. *Id.* at ¶ 9.

On February 27, 2004, plaintiffs filed a complaint in the Circuit Court of St. Clair County, Alabama. The complaint contained the following counts against all defendants: Count One (AEMLD); Count Two (Negligence);[4] Count III (Breach of Express Warranty); Count IV (Breach

---

[3] Depo Provera is a medication commonly prescribed to women as a contraceptive alternative to "the pill." Depo Provera, taken as an injection, contains a synthetic hormone similar to the natural hormone progesterone and is offered to protect women from pregnancy for three months per injection. *See* Compl. ¶ 6.

[4] Count Two claims that defendants failed to exercise due care by committing the following acts and omissions:

a. Failed to adequately and properly test and inspect Depo Provera so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured or sold.

b. Failed to utilize and/or implement a reasonably safe design in the manufacture of Depo Provera.

c. Failed to manufacture Depo Provera in a reasonably safe condition for which it was intended;

d. Failed to adequately and properly warn the Plaintiff purchasing Depo Provera of the risks of complications when used in a manner for which it was intended;

e. Failed to adequately and properly warn the Plaintiff purchasing Depo Provera of the risks of diseases when used in a manner for which it was intended;

f. Failed to adequately and properly labeled (*sic*) Depo Provera so as to warn the Plaintiff of the risks of complications;

g. Failed to adequately and properly label Depo Provera so as to warn the Plaintiff of the risks of complications;

2

of Implied Warranty); Count V (Damages); Count VI (Unjust Enrichment)[5]; and Count VII (Loss

of Consortium by Mr. Fowler)  On April 7, 2004, defendants filed a notice of removal, alleging the

existence of complete diversity of citizenship between the parties and fraudulent joinder of the non-

diverse defendant, Watson.  On April 7, 2004, defendant Watson filed the motion to dismiss at issue

here.[6]  Plaintiffs responded with a motion to remand.  The court considers both motions here.

## RULE 12(b)(6) STANDARD

Rule 12(b)(6) tests the legal sufficiency of a complaint.  When considering a Rule 12(b)(6)

motion, the court assumes that all factual allegations pled in the complaint are true.  *United States*

---

> h.     Manufactured which (*sic*) constituted a hazard to health;
> i.     Manufactured Depo Provera which caused adverse side effects; and
> j.     Were otherwise careless and negligent.

*See Compl.* ¶ 20.

[5] Specifically, Count VI alleges that defendants have profited and benefitted from
plaintiff's use of Depo Provera.  Additionally, Count VI alleges:

> Defendants . . . have voluntarily accepted and retained these profits and
> benefits, derived from the Plaintiff, with full knowledge and awareness that,
> as a result of Defendants'. . . fraud and other conscious and intentional
> wrongdoing, Plaintiff did not receive a product of the quality, nature or fitness
> that had been represented by Defendants . . . or that Plaintiff, as a reasonable
> consumer, expected.

> By virtue of the conscious wrongdoing alleged in this Complaint, Defendants
> ... have been unjustly enriched at the expense of the Plaintiffs, who are
> entitled to in equity, and hereby seek the disgorgement and restitution of
> Defendants . . . . wrongful profits, revenue, and benefits, to the extent, and
> in the amount, deemed appropriate by the Court . . . ;

*Id.* ¶¶ 35-36.

[6] The court notes that Watson is the only defendant filing the motion to dismiss at issue
here.  Defendant P&U Co. submitted the response in opposition to plaintiffs' motion to remand.
*See infra.*

3

*v. Gaubert*, 499 U.S. 315, 327, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). All factual allegations are to be construed in the light most favorable to the plaintiff. *Brower v. County of Inyo*, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). Dismissal under Rule 12(b)(6) is appropriate "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations' of the complaint." *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1282 (11th Cir. 2002) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## MOTION TO REMAND STANDARD

Federal courts are courts of limited jurisdiction. *See Russell Corp. v. American Home Assurance Co.*, 264 F.3d 1040, 1050 (11th Cir. 2001). Therefore, federal courts have power to hear only those cases that they have been authorized to hear by the Constitution or by Congress. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The limited nature of federal court jurisdiction has caused the Eleventh Circuit to favor remand of removed cases where federal jurisdiction is not absolutely clear. *Russell Corp.*, 264 F.3d at 1050. The removal statute is to be construed narrowly with doubt construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107-09 (1941).

A case may be removed to federal court only if the case could have been brought originally in federal court pursuant to the court's diversity or federal question jurisdiction. *See* 28 U.S.C. § 1441(a). However, diversity will not support removal jurisdiction if any properly joined defendants are citizens of the state in which the suit was originally filed. *See* 28 U.S.C. § 1441(b). The determination of whether federal jurisdiction exists must be made on the face of the plaintiff's well-pleaded complaint. *Pacheco De Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998). An anticipated or even inevitable federal defense generally will not support removal. *Id.* at 1373 (citing

4

*Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987)). The burden of establishing federal jurisdiction is placed on the defendant, with all doubts resolved in favor of remand, *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996). When multiple defendants are involved, all defendants must consent to removal. *Russell Corp.*, 264 F.3d at 1050.

## ARGUMENTS

## MOTION TO DISMISS

I.    Defendant Watson's Motion

Watson submits that no cause has been stated against him under Alabama law. Relying on *In re Rezulin Products Liability Litigation*, 133 F. Supp. 2d 272, 287-88 (S.D.N.Y. 2001)(predicting Alabama law), Watson argues, a plaintiff patient cannot state a cause of action against a sales representative (or account manager like defendant) of a distributor of a prescription drug. Watson further relies on the Alabama Supreme Court's decision in *Walls v. Alpharma USPD, Inc.*, 2004 WL 406759 (Ala. March 5, 2004).

In support of dismissal, Watson relies on his own affidavit, which avers that he was not a manufacturer of Depo-Provera and that he was never involved in the manufacture, development, or testing of the drug. Watson alleges that he has not had dealings with either of the plaintiffs.

Watson's affidavit further provides; Watson has "not made any statements to the general public or participated in any advertising or promotion to the general public concerning Depo Provera . . ."; Watson was not a physician or pharmacist and thus never prescribed or filled a prescription for Depo Provera; As an employee of a distributor, Watson's role was taking orders from physicians' offices; "If their order included a request for Depo-Provera . . . this product, with the information as packaged by the manufacturer, was shipped with the order to their [the physicians'] offices"; and

5

Watson was not a "seller" of Depo Provera.

### A.    Counts One and Two – AEMLD and Negligence

A threshold element of recovery for an AEMLD claim, Watson contends, is showing that defendants "manufactured and/or sold the allegedly defective product." *See Turner v. Azalea Box,* 508 So. 2d 535, 254 (Ala. 1987); *Atkins v. Am. Motors Corp.,* 335 So. 2d 134 (Ala. 1976). Courts from other jurisdictions interpreting Alabama product liability tort theories, Watson claims, have held that no cause of action is stated against sales representatives since they are not "sellers." *See In Re Rezulin, supra,* at 287-88 (S.D.N.Y. 2001). *See also Andrews, et al, v. Bayer Corp., et al; In re Baycol Products Litigation,* MDL No. 1431, slip op. 4 (D. Minn. March 26, 2004)(attached as Exhibit B).

These courts considered the purpose of the AEMLD in analyzing the potential liability of sales representatives of drug manufacturers. *In Re Rezulin* stated: "The AEMLD is founded on 'broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products.'" 133 F. Supp. 2d at 287 (quoting *Atkins* at 139). Furthermore, the *Rezulin* court found: "The sales representative joined in the Alabama case neither manufactured, sold nor supplied Rezulin (the prescription drug at issue in the case). Rather, he was an 'agent of the manufacturer and seller.'" *Id.* at 287-288. Here, Watson repeats, he was neither the manufacturer nor seller of Rezulin. Furthermore, Watson asserts, he is even further removed from liability than the sales representative in *Rezulin* since he was only the distributor's agent.[7]

---

[7] Watson again quotes *Rezulin*: " As a corporate employee, he [the representative] was 'not the one best able' to prevent the sale of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for

6

Regarding the negligence claims, Watson asserts, they should be dismissed for the same reason, i.e., he was neither the "manufacturer" nor "seller" of Depo Provera. *See Norton Co. v. Harrelson*, 176 So. 2d 18, 20 (Ala. 1965).[8] Additionally, Watson argues, since the negligence count contains the language of the AEMLD, i.e., "It could have been reasonably anticipated by the Defendants . . . that said product would become inherently or imminently dangerous to human life or health when put to its intended, ordinary and customary use," it is redundant with the AEMLD count. Alabama courts have found that when two counts are redundant, the negligence claim is not considered to constitute a separate cause of action. *See Veal v. Teleflex, Inc.*, 586 So. 2d 188, 191 (Ala. 1991).[9]

Watson relies on the *Walls* decision as supporting his position. *See* Exhibit C. In *Walls*, the plaintiff sued her pharmacist for failure to warn of foreseeable injuries from the use of the prescription drug he dispensed to her. The Northern District of Alabama certified the following question to the Alabama Supreme Court: "Does a pharmacist have a duty to warn of foreseeable supposing that it would impose liability on the sales representatives in this case."

[8] The *Norton* court stated:

> This doctrine [of manufacturer's liability] is applicable in a limited number of situations. The defendant must be either the manufacturer or seller of the injury-producing article. There is no privity of contract between the defendant and the injured plaintiff. At the time complained of the article must have been applied to the use for which it was manufactured and sold and that use must be in the usual and customary manner. Where these circumstances exist the manufacturer or seller will be liable for an injury proximately resulting from the use of the article but only where the article is inherently or imminently dangerous to human life or health, or becomes so when put to its intended use in the proper manner. This liability arises from either the negligent manufacture of the article or negligence in selling it.

[9] This court notes that *Veal* does so suggest.

injuries from the use of a prescription drug he/she is dispensing under AEMLD, common-law negligence or other Alabama law?"

In *Walls*, the pharmacist had direct contact with the plaintiff and had directly sold the prescription drug to the plaintiff. Even in that situation, Watson contends, the court applied the learned intermediary doctrine and held that the pharmacist had no duty to warn a customer or any other ultimate customer of the risk or potential side effects of the prescription drug. The Supreme Court observed that

> where prescription drugs are concerned the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This special standard for prescription drugs is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. *See* Restatement (Second) of Torts, Section 388 (1965).

*Walls* at *3 (citing *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 at 1276)(citations omitted). The *Walls* court further noted language from other cases that to impose a duty to warn on a pharmacist would "intrude on the doctor-patient relationship and would force the pharmacist to practice medicine without a license." *Id.* at *4.[10]

Defendant concludes: "The rationale which the Alabama Supreme Court followed in holding that prescription drugs are an exception to the Restatement's general rule certainly is even more applicable in the case at bar. If the manufacturer's duty to warn flows only to the physician and if other parties would be liable for interfering in the physician-patient relationship should advice be given to the patient, then it is abundantly clear that Charles Watson cannot be subject to potential liability under Alabama law."

---

[10] This court does not find *Walls* to be significantly apt here.

8

**B.     Counts Three and Four – Breach of Express and Implied Warranties**[11]

According to Watson, a breach of warranty claim (whether express or implied) arises exclusively against a product's "seller." *See* Ala. Code §§ 7-2-313(1), 7-2-314(1), and 7-2-315. The Alabama courts, Watson argues, have affirmed this principle. *See, e.g., Rutledge v. Arrow Aluminum Indust.*, 733 So. 2d 412, 417 (Ala. Civ. App. 1998). The *Rutledge* court found:

> With regard to Rutledge's AEMLD and breach of implied warranty of fitness claims against Foshee Builders, it is undisputed that Foshee Builders bought the sliding glass door and that a subcontractor installed the door. Rutledge failed to present any evidence that Foshee Builders is in the business of selling sliding glass doors. Therefore, we conclude that Foshee is not a seller within the meaning of the AEMLD or § 7-2-103 and that the trial court properly entered a summary judgment in favor of Foshee Builders on Rutledge's AEMLD and breach of implied warranty of fitness claims.

-------

[11] To the extent the warranty claims are redundant with AEMLD claims and based on the allegation that the drug was unreasonably dangerous, defendant argues, these claims are due to be dismissed due to the distinction between tort and UCC causes of action. According to defendant, whether Depo-Provera is unreasonably dangerous is not properly addressed in a warranty claim, only in an AEMLD claim. *See Yarbrough v. Sears, Roebuck & Co.*, 628 So. 2d 478 (Ala. 1993), which found:

> The Yarbroughs' claim of a breach of the implied warranty of merchantability is to the effect that the kerosene heater was unreasonably dangerous and therefore could not be merchantable. "Such an argument ignores the clear distinction between causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama." *Shell v. Union Oil Co.*, 489 So.2d 569, 571 (Ala.1986). Whether the kerosene heater was unreasonably dangerous is not a question properly addressed in a claim alleging breach of warranty under the U.C.C., but it could be, and was, properly raised in a claim under the AEMLD.

*Compare Spain v. Brown & Williamson Tobacco Corp.*, 2003 WL 21489727 (Ala. 2003)(distinguishing *Yarbrough*). In addressing the certified question from the Eleventh Circuit about the implied warranty of merchantability, the court distinguished *Yarbrough* based on the failure to allege that the product was not fit for the ordinary purpose. The *Spain* court then held: "[A] claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product."

9

Watson reiterates that his position is an account manager of McKesson, a corporation which distributes pharmaceutical products ordered by physicians. As such, Watson asserts, he is not a "seller" for purposes of the U.C.C.

Moreover, Watson argues, an additional reason to dismiss the warranty claim is that Watson had no contact with plaintiffs. Under Alabama law, Watson contends, express warranties arise from affirmative statements of fact. *See* Ala. Code § 7-2-313 (1975). Similarly, Watson argues, an implied warranty cannot arise unless the plaintiff relies on the seller's skill or judgment during the purchase. *See Ex Parte General Motors Corp.*, 769 So. 2d 903, 911 (1999). Since Watson had no contact with plaintiffs, he could not have made affirmative statements or express warranties to them. Additionally, plaintiffs could not have relied on his skill or judgment during their purchase. As a final reason to dismiss plaintiffs' implied warranty claim, Watson asserts, he is not a "merchant with respect to goods of that kind" as required by § 7-2-314. *See Loeb & Co. v. Schreiner*, 321 So. 2d 199 (Ala. 1975); *Huprich v. Bitto*, 667 So. 2d 685 (Ala. 1995).

### C.   Count Five - Unjust Enrichment

Defendant Watson quotes the Alabama Supreme Court in *Mitchell v . H&R Block, Inc.*, 783 So.2d 812, 817 (Ala. 2000): "[T]he essence of the theories of unjust enrichment ... is that a Plaintiff can prove facts showing that Defendant holds money, which in equity and good conscience, belongs to the Plaintiff or holds money which was improperly paid to Defendant because of mistake or fraud." *See also Ammons v. Coffee County*, 716 So. 2d 1227 (Ala. Civ. App. 1998).

First, Watson argues, since plaintiffs have not stated a valid, independent claim against him, they cannot prevail on their unjust enrichment claim. Second, Watson contends, plaintiffs have not alleged in the complaint that Watson benefitted personally from the sale of Depo-Provera or

10

collected money from plaintiffs in exchange for this product. Watson repeats his contention that he
is not a "seller" of the product.

II.   Plaintiffs' Response[12]

    A.   Standard of Review

    This court must first determine if it has jurisdiction over the complaint. *See Cabalceta v.
Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir. 1989); *Univ. of South Alabama v. Am. Tobacco
Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Strict construction of the removal statutes, plaintiffs argue,
is required. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941); *Clay v. Brown &
Williamson Tobacco Corp.*, 77 F. Supp. 2d 1220 (M.D. Ala. 1999).

    Further, plaintiffs argue, this court must construe all disputed questions of fact and
controlling substantive law in favor of plaintiffs on removal. *Coker v. Amoco Oil Co.*, 709 F.2d
1433, 1440-41 (11th Cir. 1983)("In determining whether joinder of a resident party has been
fraudulent, a district court evaluates the factual allegations in the light most favorable to the
plaintiff.").

    The removing party, plaintiffs assert, bears a heavy burden in establishing fraudulent joinder.
The test for determining whether joinder of a defendant has been fraudulent is as follows:

        (1) [L]ook to see whether there is <u>no possibility that plaintiff can establish any cause
        of action against the resident defendant</u>; and

---

[12] Plaintiffs note their contemporaneous filing of a motion to remand for lack of
jurisdiction. According to plaintiffs, the arguments in support of remand are identical to their
response to dismissal. The motion to dismiss and motion to remand, plaintiffs contend, are
"really just both sides of the same coin." By plaintiffs' account, if this court grants the motion to
remand, the case will be due to be remanded without this court's consideration of the motion to
dismiss. On the other hand, plaintiffs contend, if the court denies remand, the court must
necessarily have determined plaintiffs had no possibility of establishing any cause of action
against the resident defendant, thus requiring the granting of defendant's motion to dismiss.

11

(2) [L]ook to see whether plaintiff has fraudulently pled jurisdictional facts in order to bring the resident defendant into state court.

*See Cabalceta* at 1561. (Emphasis added). "When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Fowler v. Provident Life & Accident Ins. Co.*, 256 F. Supp. 2d 1243, 1247 (N.D. Ala. 2003)(citation omitted). Further, *Fowler* provided: "The plaintiff need not have a winning case against the allegedly fraudulent defendant; she need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate." *Id.* (citation omitted).

**B.    Argument**

1.    <u>Plaintiffs Have Sufficient Evidence to Support an AEMLD Claim and a Common Law Negligence Claim Against Defendant, Charlie Watson.</u>

Plaintiffs tout *Clay v. Brown & Williamson Tobacco Corp.*, 77 F. Supp. 2d 1220 (M.D. Ala. 1999) as analogous. In *Clay*, plaintiffs argue, the court held that plaintiff had an arguable claim against an account manager for defendant pursuant to the AEMLD because the account manager "had superior knowledge to that of the average consumer." *Id.* at 1224. Additionally, the *Clay* court found, additional discovery provided an arguable showing that the account manager "actively participated in the sale and distribution of Brown & Williamson tobacco products," which further bolstered plaintiff's AEMLD claim. In part, the *Clay* court relied on the following rationale from *Seaborn v. R.J. Reynolds Tobacco Co.*, No. 96-T-1540-N (M.D. Ala. 1996):[13]

> [Plaintiff] seeks to hold not only R.J. Reynolds liable under the AEMLD, he seeks to hold some of the company's individual employees--Tate, Huffman, McDermott, Hightower, and Hinson--liable as well. "In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective

---

[13] No copy of *Seaborn* has apparently been provided to this court.

12

of whether they were acting in a corporate capacity." *Ex parte Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.*, 496 So.2d 774, 775 (Ala.1986) (citing *Candy H. v. Redemption Ranch, Inc.*, 563 F.Supp. 505, 513 (M.D.Ala 1983)); see also *Chandler v. Hunter*, 340 So.2d 818, 822 (Ala.Civ.App, 1976). Obviously, to the extent R.J. Reynolds allegedly violated the AEMLD, it acted through its employees; the company does not employ ghosts. [Plaintiff] should be allowed to pursue these individual defendants, and, if, after discovery, it should turn out that he has named the wrong persons, he should be allowed to make substitutions.

In this case and its companion case, *Jenkins v. R.J. Reynolds Tobacco Co. No. 96-T-1489-N* (M.D. Ala. 1996), plaintiffs note, the court found no evidence of fraudulent joinder. Additionally, plaintiffs rely on the *Clay* court's statement: "Rule 11 recognizes that a Plaintiff may need additional discovery to establish an evidentiary basis for an allegation." *Id.* at 1224 (citing *Sellers v. Foremost Ins. Co.*, 924 F. Supp. 1116 (M.D. Ala. 1996)). The court found that plaintiff had met her burden pursuant to Rule 11 and believed that additional discovery could show that the account manager participated in the tort against the plaintiff due to his position with defendant tobacco company.

Here, plaintiffs assert, Watson is an account manager at McKesson, and Birmingham is part of his sales territory. In this capacity, plaintiffs argue, Watson sold, distributed and supplied medical and surgical equipment, i.e., Depo-Provera, to Mrs. Fowler. *See* Watson Decl..

Plaintiffs rely on "The Job Description of an Account Manager at McKesson Medical-Surgical" posted on McKesson's website, Pl. Ex. B. The job description, plaintiffs argue, lists the following responsibilities for McKesson Account Manager[14]:

*   Selling products or services;
*   Performing field promotion work and developing new accounts;
*   Demonstrating products and/or services and providing assistance in the

---

[14] The McKesson website, plaintiffs note, lists openings for account managers in cities including LaCrosse and Madison, Wisconsin; Jacksonville, Florida; Portland, Oregon; etc. Plaintiffs contend that all the job descriptions for the locations listed are identical.

best application of products or services;
- Answering all questions concerning products or services and referring questions as necessary;
- Investigating product/service warranty claims to ensure resolution within marketing policies;
- Contacting prospects and explaining features and merits of products or services offered, utilizing persuasive sales techniques.

*See* Pl. Ex. B.

According to plaintiffs, Watson has superior knowledge of Depo-Provera compared to the average consumer, since his job duties include demonstrating the products/services, providing assistance in the best application of the products/services, and explaining the features and merits of the products/services offered. Moreover, plaintiffs argue, in this case they have stronger support for their claims against Watson than the *Clay* plaintiff since they already have proof of Watson's superior knowledge to that of the average consumer regarding Depo-Provera (as evidenced by the foregoing job description).

The AEMLD claim against Watson, plaintiffs contend, is "particularly strong considering that part of Mr. Watson's job description provides for him to 'demonstrate products and/or services and provide assistance in the best application of product or services.'" Plaintiffs further argue:

> In this case, the product Depo-Provera, was used for a purpose or application other than the purpose or application for which it had been approved by the Food and Drug Administration (hereinafter FDA). Therefore, through Mr. Watson's assistance with the best application of Depo-Provera, the plaintiff, Margie Fowler was given Depo-Provera for a purpose other than the purpose for which it had been approved by the FDA.[15]

In the complaint, plaintiffs assert, they clearly alleged that Watson was engaged in the business of marketing, selling, advertising, supplying, and distributing Depo-Provera, that the

---

[15] This allegation, the court notes, does not appear to be contained in the complaint.

14

product was defective and unreasonably dangerous, and that as a result Fowler was injured. Plaintiffs repeat the general content of their AEMLD and negligence claims.[16]

Lastly, plaintiffs argue, a corporation's employees are liable for torts in which they personally participated, even if they were acting in a corporate capacity. *See Ex Part Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.*, 496 So. 2d 774, 775 (Ala. 1986). According to plaintiffs, McKesson could not violate the AEMLD on its own; rather, it had to act through its employees. Moreover, plaintiffs add, Watson committed negligence beyond the bounds of the AEMLD.

### 2.    The Defendant's Argument for Removal Lacks Legal Support.

Plaintiffs attempt to distinguish *In re Baycol* and *In re Rezulin*. According to plaintiffs, these cases represent the opinions of the Minnesota and New York federal district courts, respectively, interpreting Alabama law and thus should not be treated as controlling or given weight in this case. Further, plaintiffs contend, *In re Baycol* involved affidavits from the non-diverse defendants that they were not sellers, manufacturers, developers, or testers of the drug Baycol, and the reported opinion indicates that the *In re Baycol* plaintiffs had no evidentiary support to contradict these affidavits. On the other hand, plaintiffs argue, they possess evidence to contradict Watson's affidavit. Although in *In re Rezulin*, plaintiffs assert, the sales representatives were held to be fraudulently joined, here Watson is not a sales representative but rather an account manager with superior knowledge. Again, plaintiffs rely on *Clay, supra*.

Moreover, plaintiffs contend, defendant mistakenly relies on *Walls v. Alpharma USPD, Inc.* According to plaintiffs, *Walls* held that a pharmacist does not have a duty to warn a customer or ultimate customer of risks or side effects pursuant to the learned-intermediary doctrine. However,

---

[16] The court has summarized the complaint *supra*.

15

plaintiffs argue, *Walls* neither limits an account manager's duty to warn nor forecloses AEMLD/common law negligence claims against an account manager with superior knowledge and active involvement in the sale/distribution of a product. Furthermore, plaintiffs contend, the pharmacist in *Walls* did not work directly for the manufacturer, distributor, supplier, advertiser, or seller of the drug made the basis of the lawsuit, unlike Watson, who works directly for McKesson (which allegedly distributed, supplied, advertised and sold Depo-Provera.)

**III.     Defendant Watson's Reply**

First, Watson argues, plaintiffs' reliance on *Clay v. Brown & Williamson Tobacco Corp.* is misplaced. While *Clay* involved cigarettes and a defendant who worked for the actual manufacturer, the Fowler case involves a prescription medication and a defendant who worked for a distributor. Further, Watson reminds the court, the Alabama Supreme Court recently applied the learned-intermediary doctrine to pharmacists in *Walls*, *see supra*. According to Watson, *Walls* expanded and reinforced the exception to AEMLD liability in cases arising from the use of prescription medications where the <u>only</u> duty to warn runs from the manufacturer to the patient's doctor.[17] *Walls*, Watson argues, clarified that the learned intermediary doctrine forecloses the existence of a duty to

---

[17] In *Stone v. Smith, Kline & French Laboratories*, 731 F.2d at 1575 (11th Cir. 1984), Watson notes, the Eleventh Circuit certified to the Alabama Supreme Court the question of whether an adequate warning to the prescribing physician but not to the ultimate consumer was sufficient as a matter of law. The Alabama Supreme Court in *Stone v. Smith, Kline & French Laboratories*, 447 So. 2d 1301 (Ala. 1984) adopted the Fifth Circuit's learned-intermediary doctrine , which held that pharmaceutical companies who were selling prescription drugs only had a duty to warn the prescribing doctor. According to Watson, the *Walls* court cited with approval language from the *Stone* opinion that imposing a duty to warn on a pharmacist would intrude on the doctor/patient relationship and force the pharmacist to practice medicine without a license, and such reasoning should apply with equal force to Watson. Furthermore, Watson notes, *Walls* also cited language from other courts to the effect that it would be illogical to impose a greater duty on the pharmacist than on the manufacturer. By defendants' account, this same argument should apply to the account manager of a distributor.

16

warn, and thereby any AEMLD and negligence claim, against someone other than the manufacturer.

As in the instant case, *Walls* involved injuries resulting from a prescription drug. According to Watson, the fact that the product could only be obtained by prescription from a licensed physician led the Supreme Court to apply the learned-intermediary doctrine. Watson again quotes *Walls* and criticizes plaintiffs' position that *Walls* is inapplicable.[18]

In the instant case, Watson argues, the complaint alleges that Depo-Provera was commonly prescribed and that plaintiff was given injections by a licensed health care provider in a clinical setting. Plaintiffs' representation to the court that Watson sold Depo-Provera "to the plaintiff in this case," Watson contends, is false, since his affidavit confirms that he never had contact or dealings with the Fowlers, that he is not a physician or pharmacist, and that he never prescribed or filled a prescription for Depo-Provera. As an employee of the distributor, Watson alleged, his role was limited to taking orders from physicians' offices then shipping any orders for Depo-Provera. According to Watson, he was not involved in the doctor's decision to administer or prescribe Depo-Provera to Mrs. Fowler or in the sale of the product to the plaintiffs. Moreover, Watson points out, Watson has confirmed that he has "not made any statements to the general public or participated in any advertising or promotion to the general public concerning Depo-Provera."

Watson again asserts that the *Walls* rationale regarding prescription drugs as an exception to the Restatement's general rule "is even more applicable in the case at bar" and reasons as follows: "If the manufacturer's duty to warn flows only to the learned-intermediary physician and if other parties, without the medical education or knowledge of the medical history of the patient, would be liable for interfering in the physician-patient relationship should advice be given to the patient, then

---

[18] As indicated, this court feels that defendant over-emphasizes the significance of *Walls*.

17

it is abundantly clear that "...Watson, as an account manager of a *distributor*, owed no duty to the Plaintiffs and cannot be subject to potential liability under Alabama law."

This court, Watson argues, should not hold that he owed a duty to consumers he had never met and had no way to meet simply because his employer's website states that he is to demonstrate products and provide assistance. Any such holding, Watson contends, would be contrary to the AEMLD's purpose stated in *Atkins v. American Motors Corporation*, 335 So. 2d 134, 139 (Alabama 1976): "[The AEMLD is founded on] broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products." As neither the manufacturer nor seller of Depo-Provera, Watson argues, he is not the "one best able to prevent the distribution of the product." *See In Re Rezulin* at 287-88 (S.D.N.Y. 2001).[19]

Despite plaintiffs' argument to the contrary, Watson asserts, *In re Rezulin* and *In re Baycol*, *see supra*, should be given weight, as both federal courts were applying Alabama law. Watson reminds this court of the *Erie* rule, i.e., federal courts exercising diversity jurisdiction must apply the law of the state as interpreted by the state's highest court, and in the absence of state court precedent, the federal court must ascertain and apply state law as the court would if faced with a similar case. Unlike *Clay* (plaintiffs' supporting case), Watson argues, *In re Rezulin* and *In re Baycol* directly address AEMLD and negligence claims against sales representatives in cases involving prescription drugs. Notably, Watson asserts, plaintiffs have offered nothing to contradict the holdings of these cases except Watson's position as an account manager rather than a sales

---

[19] A threshold element of recovery under AEMLD, Watson repeats, is that plaintiff must prove that the defendant "manufactured and/or sold the allegedly defective product." *See Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987).

18

representative. While plaintiffs suggest that Watson's title as an account manager somehow elevates him in the distribution chain, Watson argues, it is clear that he merely takes orders from physicians' offices.

In interpreting Alabama law, Watson contends, *In re Rezulin* and *In re Baycol* held that no cause of action was stated against sales representatives sued with respect to prescription drugs. *Rezulin* found the sales representative in that case had not manufactured, sold, or supplied the drug but was rather "an agent of the manufacturer and seller." Citing *Atkins*, the *Rezulin* court explained: "As a corporate employee, he [the sales representative] was 'not the one best able' to prevent the sale of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representatives in this case.'"

Since he did not manufacture or sell Depo-Provera, Watson argues, plaintiffs can state no possible negligence claim against him. Watson reiterates his position that the negligence claim embodied in Count II is redundant. Furthermore, Watson concludes, *Walls* confirmed that a negligence count cannot lie against Watson. In answering the certified questions, Watson argues, the Alabama Supreme Court held that, pursuant to the learned-intermediary doctrine, only the prescribing physician had a duty under a common law negligence theory.[20]

---

[20] This court quotes the specific holding in *Walls*:

> On the basis of the foregoing authority and persuasive authority, we hold as follows. The learned-intermediary doctrine forecloses any duty upon a pharmacist filling a physician's prescription, valid and regular on its face, to warn the physician's patient, the pharmacist's customer, or any other ultimate consumer of the risks or potential side effects of the prescribed medication except insofar as the prescription orders, or an applicable statute or regulation expressly requires, that an instruction or warning be included on the label of the dispensed

19

Since plaintiffs' opposition only addressed Counts I and II (AEMLD and negligence) and made no attempt to oppose dismissal of Counts III, IV, or V (breaches of warranty and damages), Watson argues, Counts III, IV, and V are due to be dismissed for the reasons set forth above.[21]

MOTION TO REMAND

I.    Plaintiffs' Motion

Plaintiffs' arguments in favor of remand appear to be identical to those set forth in their response to the motion to dismiss. *See supra.*

II.    Defendant P&U Co.'s Response[22]

A.    Summary of Argument

Since plaintiffs' motion to remand only addresses AEMLD and negligence, P&U Co. argues,

---

medication or be otherwise delivered. To the extent that the learned-intermediary doctrine applies, foreseeability of injury is eliminated as a basis for liability upon the pharmacist. To the extent that the learned-intermediary doctrine applies, the duty to determine whether the medication as prescribed is dangerously defective is owed by the prescribing physician and not by the pharmacist filling the prescription. Any question of what persons are due the duty owed by the prescribing physician is not before us. Accordingly, both questions certified to us are answered in the negative.

[21] Incidentally, this court notes, plaintiffs also have not addressed Count VI (unjust enrichment) and Count VII (loss of consortium). Defendant Watson addressed Count VI, *supra*, but not Count VII.

[22] Defendant P&U Co. filed the opposition to plaintiffs' motion to remand. P&U Co. refers generally to arguments in its Notice of Removal. The court has considered fully but does not set forth here the contents of the Notice of Removal.

Additionally, this court notes, P&U Co. has filed a supplemental opposition to remand on June 4, 2004. In its supplemental submission, P&U Co. contends that the right to remove is determined by the plaintiffs' pleading at the time of the petition for removal. *See Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989). As such, P&U Co. argues, this court cannot rely on the Fowlers' post-removal amendment to their complaint in determining subject matter jurisdiction.

20

only those claims have been addressed here. P&U Co. argues that Watson was fraudulently joined. The complaint, P&U Co. points out, contains a single specific reference to Watson in paragraph four, wherein it alleges that he "sold or distributed" Depo Provera on behalf of McKesson. Therefore, P&U Co. contends, there is not even an allegation that Watson sold or distributed the Depo Provera received by plaintiffs.

Watson worked for McKesson Medical-Surgical, P&U Co. alleges, which did not manufacture the product but merely distributed it. According to P&U Co., Watson had no dealings with patients or knowledge/information about patients' medical histories, symptoms, prognoses, or courses of treatment. Significantly, P&U Co. argues, Watson had no interaction with the Fowlers.

P&U Co. criticizes plaintiffs' reliance on tobacco-related cases. Under the law, P&U Co. contends, tobacco is not treated in the same manner as prescription medications, and that distinction proves fatal to plaintiffs' argument.

Under Alabama law, P&U Co. argues, prescription medications are treated as "unavoidably unsafe products" as described in Comment k to Section 402 of the Restatement of Torts (Second). According to P&U Co., prescription medications are "neither defective nor unreasonably dangerous if such a product is properly prepared and is accompanied by proper directions and warnings." *See* *Stone* at 1302. P&U Co. repeats the substance of the learned intermediary doctrine as applicable to prescription drugs. *See* *Walls* at *2. Only prescription medications, P&U Co. contends, are governed by the learned intermediary doctrine. P&U Co. quotes the *Stone* case as follows: "[W]e cannot quarrel with the general proposition that where *prescription* drugs are concerned, the manufacturer's duty to warn is *limited* to an obligation *to advise the prescribing physician* of any potential dangers that may result from the drug's use. This special standard for prescription drugs

21

is an *understandable exception to the Restatement's general rule* that one who markets the goods must warn foreseeable ultimate users of dangers inherent in his products." (Emphasis added). P&U Co. argues that the collective authority of *Walls*, *In re: Baycol*, and *In re Rezulin* should govern the fraudulent joinder issue rather than the *Clay* case (involving tobacco).

When faced with a fraudulent joinder issue, P&U Co. argues, this court should "pierc[e] the pleadings and consider[] summary judgment-type evidence such as affidavits and deposition testimony." *See Sellers v. Foremost Ins. Co.*, 924 F. Supp. 1116, 1118 (M.D. Ala. 1996)(citation omitted). *Sellers* further provided: "Tolerance of factual contentions . . . when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties [or] make claims . . . . without any factual basis or justification."(quoting F.R.C.P. 11, Comm. Notes).

B.    **Responsive Argument**

The *Rezulin* and *Baycol* courts, P&U Co argues, considered Alabama law. According to P&U Co., plaintiffs have not attempted to distinguish those cases. Both cases involved individual employees of prescription drug manufacturers, P&U Co. points out, making those individual employees substantially closer to the manufacture of the product at issue than Watson (who was the employee of a commercial distributor of the product). P&U Co. again highlights *Rezulin*'s assessment of the sales representative: "As a corporate employee, he was not 'the one best able' to prevent sales of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representative in this case."

22

Furthermore, P&U Co. argues, plaintiffs have not acknowledged the *Bowman v. Coleman* decision (No. 96-0448-P-C)(S.D. Ala. 1996), which held that a salesperson was fraudulently joined under AEMLD and negligence theories because (1) "the policy goals underlying the AEMLD would not be advanced in any way by holding persons . . liable in their role as . . . sales representatives" and (2) the salesperson was "neither a seller nor a manufacturer." Finally, P&U Co. argues, the Fowlers have not adequately distinguished *Walls*.

According to P&U Co., plaintiffs have failed to show Watson's involvement in Mrs. Fowler's prescription and failed to present evidence of Watson personally participating in any tort against them. Instead, P&U Co. argues: "[P]laintiffs coyly try to avoid this considerable problem in their pleadings by citing to generic information describing similar employees' job responsibilities downloaded from the internet. Further, by taking bits and pieces of information from this website, they make the incredible suggestion that Mr. Watson was responsible for the plaintiffs' receipt of the product at issue for a purpose *other* than that provided in the FDA-approved labeling accompanying the product -- an allegation completely absent from the complaint." In this vein, P&U Co. repeats information from Watson's affidavit. *See supra.*

Moreover, P&U Co. argues, the *Clay* court's finding of "superior knowledge" of a tobacco account manager is irrelevant to this case, since Depo Provera is a prescription drug. In *Clay*, P&U Co. contends, the court concluded that tobacco managers were not fraudulently joined in a cigarette products liability action since they were "likely to hold some superior knowledge regarding the nature of cigarettes." *See* 77 F. Supp. 2d at 1224. In the pharmaceutical context, P&U Co. asserts, the element of "superior knowledge" of a sales representative, or even a pharmacist, is irrelevant. P&U Co. argues: "Anyone of legal age may walk into numerous retail establishments and purchase

23

cigarettes if they so choose. This stands in stark contrast to the manner in which one obtains a prescription medications, ..., [i.e.,] only ... from licensed physicians. These physicians' decisions on whether or not to prescribe a given medication depend upon a host of factors based upon their training, experience, and a patient's unique needs."[23]

Defendant P&U Co. repeats the reasoning and holding of *Walls* and argues: "If a pharmacist, who has actual contact with the patient, has not duty to warn a consumer under Alabama tort law, how could any such duty exist for a distributor who has no contact with the ultimate consumer?"[24] This court, P&U Co. argues, should disregard plaintiffs' attempts to circumscribe the *Walls* holding. According to P&U Co., it is the type of product at issue in *Walls* that drove the court to conclude that the learned intermediary doctrine exempts from the duty to warn non-physicians in the chain of distribution. In fact, defendant argues, *Walls* undermines every aspect of plaintiffs' argument that they may be able to make a case against Watson for allegedly possessing superior knowledge and

---

[23] P&U Co. quotes *Walls* as follows:

> [F]or it is only the physician who can relate the propensities of the drug to the physical idiosyncracies of the patient. 'It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy.'

> Neither the manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician-patient relationship. In deciding whether to use the prescription drug, the patient relies primarily on the expertise and judgment of the physician. Proper weighing of the risks and benefits of the proposed drug treatment and determining what facts to tell the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition.

[24] This court is of the opinion that the issue here is contact with the pharmacist and/or the physician, not the consumer.

24

participating in the sale and distribution. These precise arguments, P&U Co. asserts, were rejected by *Walls*. Although the pharmacist in *Walls* had superior knowledge and participated in the sale and distribution of the drug, P&U Co. argues, the *Walls* court still refused to impose liability. Thus, P&U Co. concludes, Watson cannot be liable even if he proved that he did have superior knowledge and participated in the sale and distribution of the Depo-Provera allegedly administered to Mrs. Fowler.

III.    Plaintiffs' Reply[25]

    A.    **Plaintiffs Have Shown That Watson Was Involved In Fowler Receiving Depo-Provera**

Relying on an amended complaint served on May 28, 2004,[26] plaintiffs argue, they have specifically alleged that Watson is liable pursuant to Alabama common law theories of negligence/wantonness for promoting Depo Provera for an off-label use not approved by the FDA.[27]

---

[25] The Fowlers highlight the holding in *Triggs v. John Crump Toyota*, 154 F.3d 1284 (11th Cir. 1998): "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Triggs* further stated: "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate."

[26] *See* Pl. Reply, Ex. A.

[27] The amended complaint alleges:

    At the time of the time of the incident made the basis of this lawsuit, Watson negligently, wantonly, and intentionally, promoted the use of the drug Depo Provera to a group of doctors who practiced under the name Henderson Walton Women's Center (Hereinafter Henderson Walton) for use by the physicians at Henderson Walton for administration to their patients, including ... Margie Fowler, for the management of the condition known as endometriosis.

    Watson communicated with the physicians and staff at Henderson Walton on a direct one-to-one basis and promoted the sale of Depo Provera. In the course of this promotion Defendant Watson advised the physicians as to the applications and uses of

According to plaintiffs, Henderson Walton is still Watson's client, and Watson used the following means to promote Depo Provera to the physicians at Henderson Walton: direct one-to-one communication with those physicians; field promotion work and aggressive development of new accounts and growing existing accounts; assistance in the best application of Depo-Provera to Henderson Walton physicians; explanation of the features/merits of Depo Provera to such physicians; and use of persuasive sales techniques. As an account manager for Depo Provera, the

> the product utilizing product promotional literature, "personal persuasive sales techniques," and provided other incentives to promote sales of the subject drug the treatment and management of endometriosis.
>
> Watson engaged in these promotional efforts on a personal and individual basis and served to gain financially from such promotion. At the time these promotional efforts were undertaken, Watson knew or had reason to know that the Drug Depo Provera was not (nor is the drug currently) approved by the FDA for the management of endometriosis but was only approved by the FDA and, as per the drug warning label published by the drug manufacturer, indicated only for the prevention of pregnancy. The promotion of the drug for a purpose not approved by the FDA was in direct violation of the Food, Drug, and Cosmetic Act.
>
> Said negligently, wanton, reckless and intentional promotion of this drug caused and/or contributed to the administration of Depo Provera of Plaintiff, Margie Fowler, which proximately caused the plaintiff to suffer a stroke.

Plaintiffs, this court notes, rely upon the affidavit of one of their attorneys in the case, Ms. Harrington. Ms. Harrington's affidavit provided:

> Prior to filing this action, I called the office of the physician who administered the drug, Depo Provera (the drug which is the subject of the above case) to Margie Fowler. I asked the individual in charge of purchasing this medication, for the name of the company from which Ms. Fowler's physician obtained the Depo-Provera. I was told the drug was purchased for all the doctors at Henderson Walton Women's Clinic from the McKesson Corporation. I asked if that was where they would have purchased the drug from in 2001 and 2002 and was told yes. I contacted McKesson Corporation and asked the name of the person who was responsible for the sale of Depo-Provera to the Henderson Walton Women's Clinic in Birmingham, Alabama. I was told Charlie Watson.

26

Fowlers argue, Watson knew or had reason to know that Depo Provera was not FDA-approved for the treatment of endometriosis. Plaintiffs contend that Watson should not have promoted this use of Depo Provera and/or should have informed the physicians at Henderson Walton that Depo Provera was not approved for this use.

**B.    Defendants' Caselaw Is Neither Applicable Nor Relevant**

First, the Fowlers argue, *In re Rezulin* is distinguishable because it involved a sales representative. In the instant case, plaintiffs emphasize, Watson is an account manager rather than a sales representative.[23] Furthermore, the Fowlers argue, *In re Rezulin* did not state that liability could not be imposed on a pharmaceutical sales representative pursuant to the AEMLD; instead, the *Rezulin* court concluded that the Alabama Supreme Court would not impose liability pursuant to the AEMLD on the particular sales representative in that case. Additionally, plaintiffs argue, the *Rezulin* court did not address whether plaintiff had a negligence claim against the defendant sales representative. Most importantly, the Fowlers contend, the *Rezulin* court based its finding of fraudulent joinder on the facts that the plaintiff did not respond the affidavit filed by defendant sales representative, that the plaintiff had not shown that the sales representative sold the defective product to the decedent or decedent's doctor, that the plaintiff had not established the connection needed between the decedent and the sales representative to support a claim for fraud or fraudulent suppression, and that the sales representative at issue was not "the one best able" to prevent sales of defective drugs. Here, plaintiffs argue, those factors are not present, since plaintiffs (1) have responded to and contradicted Watson's affidavit by using McKesson's own website and (2) did not

---

[23] According to plaintiff, the McKesson website describes account managers and sales representatives as two separate positions. *See* Pl. Reply, Ex. C.

27

plead a fraud count in their complaint against Watson. Finally, plaintiffs assert, as an account manager (and pursuant to his job description) "Watson's superior knowledge would have made him highly capable of preventing the sale of defective drugs and/or the improper use of a drug." In reliance on the posted job description, plaintiff contend that Watson had one to one contact with the Henderson Walton physicians and therefore would have received first hand knowledge of reports from those physician's patients if there had been problems with Depo Provera. Plaintiffs ask: "Who better for the company to rely on but their own account manager for information as to whether a product is useful and effective or defective?"

According to plaintiff, *In re Baycol* represents a decision of a foreign court which has admitted that "no Alabama state court decision specifically addresses whether a district manager of sales manager could be held liable under the AEMLD." Notably, plaintiffs argue, the *Baycol* court found the district manager and sales manager not liable while admitting the absence of an Alabama state court decision upon which to base its finding.

Furthermore, the Fowlers argue, *Bowman v. Coleman* (relied upon in *Baycol*) is distinguishable. In that case, the plaintiff sued the store manager of Lowe's along with Lowe's Home Centers, Inc. and Coleman Company, Inc. because a Coleman heater purchased at Lowe's malfunctioned. According to the Fowlers, an account manager at McKesson and a store manager at Lowe's are not comparable "due to the difference in each one's educational background and knowledge of their products." In this vein, plaintiffs contend:

> A store manager at Lowe's may or may not have a college degree. A four year college degree is required of an account manager at McKesson. A store manager at Lowe's sells a greater number as well as a wider variety of products than an account manager at McKesson. Therefore, there is no way that a store manager at Lowe's could have the superior knowledge to be able to demonstrate every produce or service that his store offers nor could he provide assistance in the best application of

28

every product which Lowe's carries. However, being able to demonstrate products and/or services as well as provide assistance in the best application of those products and services is part of Defendant Watson's job. He is able to accomplish those tasks because he only sells, supplies, and distributes medical and surgical products.

Additionally, plaintiffs note, the *Baycol* court also relied on the affidavits which the defendant district manager and sales manager supplied in that case and in *In re Rezulin*. The Fowlers reiterate that they have responded to Watson's affidavit and shown, via his employer's website, that the affidavit is not accurate with respect to Watson's job description and duties.

Finally, plaintiffs assert, *Walls* is inapposite based on the same reasons asserted *supra*. Fowler also disputes P&U Co.'s statement that "Only prescription medications – not other products, including tobacco – are governed by the learned intermediary doctrine"; instead, Fowler argues, the learned intermediary doctrine would involve complex products, which include tobacco and tobacco litigation. Plaintiffs reiterate that the *Walls* court specifically answered a very limited question regarding pharmacists and thus only applies to pharmacists and not to account managers or sales representatives of drug companies.

## CONCLUSIONS OF THE COURT

This case represents the usual tension between what has been called this court's "unflagging" duty to exercise its jurisdiction when present[29] and the admonishments against accepting diversity jurisdiction when there are "possible" claims against non-diverse defendants. The difficulty of resolving such tension is exacerbated by the effort of each side to stretch every possible nuance from every possible case. One would think that the difference might be whether a party will remain on death row or freed to return to the idyllic confines of a country home.

---

[29] See *Moorer v. Demopolis Waterworks and Sewer Bd.*, 2004 WL 1300156 (11th Cir. 2004)(quoting *Colorado River Water Conservation Dist. v. U.S.*, 965 S. Ct. 1236 (1976)).

A further feature of this dilemma is the fact that the issue is supposed to be decided based upon objective standards but is usually influenced by the deciding courts' subjective leanings. It is tempting to quickly dispose of a case on a non-appealable basis.

Surely, as always, this court must look for some solution which does not lend itself to either arbitrariness or capriciousness. The court assumes that in this context, "possible" means more than such a possibility that a designated residence can be hit by a meteor tonight. It is possible. Surely, as in other instances, reason and common sense have some role. Surely, in the absence of total hostility toward diversity jurisdiction, the mere naming of purely adjunct parties is not sufficient to defeat it. With these thoughts and the admonitions of controlling courts in mind, this court will attempt to resolve the issues here.

The parties have not cited any directly applicable Alabama or controlling federal court cases. This court is satisfied, based upon the cases which have been cited, that there is no possibility of recovery on the claims asserted here against Watson unless there is evidence that he personally and actively sold or promoted the alleged product to applicable pharmacies or physicians after he had knowledge that the product was dangerous or defective or after he had knowledge that warnings had not been otherwise appropriately given. Here, there is no such allegation and certainly no substantial evidence to rebut evidence to the contrary.

This court is not persuaded, to any extent, by *Walls*. On the other hand, this court is at least partially persuaded by the *Rezulin* and *Baycol* cases. Those courts perhaps go further than this court would go in that they may exclude claims against even active, knowledgeable sales representatives (or account managers). While those are likely correctly holdings with regard to AEMLD claims, they may not be appropriate for failure to warn or suppression claims. Here, however, there is no

30

sufficient allegation or evidence to support the latter type claims.[30]

The motion to dismiss will be granted. The motion to remand will be denied.[31]

This 2<u>4TH</u> of June, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[30] This case is to be decided based on the allegations in the complaint at the time of removal, not as later amended.

[31] Plaintiffs have agreed that an adverse ruling on one calls for an adverse ruling on the other.

31

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

GLORIA HERNANDEZ,

Plaintiff,

-vs-                                    Case No. 6:05-cv-221-Orl-31KRS

MERCK & CO., INC., GENA ORTEGA
f/k/a Gena Ghazzi & JOHN E. (JACK)
KILKELLY,

Defendants.

## ORDER

This matter comes before the Court on the Plaintiff, Gloria Hernandez's ("Plaintiff")

Motion to Remand (Doc. 7) (the "Motion") and the Defendant, Merck & Co., Inc.'s ("Merck")

Memorandum of Law in Opposition thereto (Doc. 14). The Plaintiff also filed a Notice of

Supplemental Authority (Doc. 17), to which Merck filed a Response (Doc. 18). For the reasons

stated herein, the Plaintiff's Motion is denied.

## I.    Background

On January 12, 2005, the Plaintiff filed a Complaint (Doc. 3) against Merck, Gena Ortega

("Ortega"), and John Kilkelly ("Kilkelly") (collectively referred to, where appropriate, as the

"Defendants") in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida

alleging, *inter alia*, negligence, negligent misrepresentation, and fraud against all of the

Defendants. In essence, the Plaintiff alleges that certain cardiovascular risks were associated with

the use of Vioxx, and that the Defendants knew or should have known of those risks. The Plaintiff

EXHIBIT

L.

further alleges that despite their knowledge, the Defendants promoted the use of Vioxx, and, in the course of promoting its use, concealed its dangerous qualities, misrepresented the risks associated with its use, and failed to warn prescribing physicians of those risks.

Merck removed the case to this Court on February 14, 2005,[1] alleging that the Plaintiff fraudulently joined Ortega and Kilkelly, that Ortega and Kilkelly are not proper defendants, and thus that this Court has diversity jurisdiction over this case.[2]

On February 15, 2005, the Plaintiff filed her Motion, arguing that the case should be remanded on the basis of offensive collateral estoppel arising from two decisions in this District granting remand in cases with different plaintiffs but the same Defendants, and, in the alternative, that Merck could not show that Ortega and Kilkelly were fraudulently joined.

Merck now asserts that offensive collateral estoppel does not apply to this case, and that it can prove fraudulent joinder, and thus seeks a denial of the Plaintiff's Motion.

**II.    Legal Analysis**

   A. Offensive Collateral Estoppel

   A party properly invokes collateral estoppel when "the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action." *Cotton States Mutual Ins. Co. v.*

---

[1] Merck's Notice of Removal appears at Doc. 1.

[2] The Plaintiff is a resident of Orange County, Florida. Merck is a New Jersey corporation that is authorized to conduct business in Florida. At all times material to this case, Merck was engaged in the business of developing, manufacturing, selling and promoting Vioxx for consumer use by prescription. Ortega and Kilkelly are residents of the State of Florida. Ortega and Kilkelly were employed by Merck as sales representatives or managers to promote, and to encourage physicians to prescribe, Vioxx. It is thus clear that if Ortega and Kilkelly are proper defendants, this Court will not have diversity jurisdiction over this case under 28 U.S.C. § 1332.

*Anderson*, 749 F.2d 663, 666 (11th Cir. 1984) (internal citation and quotation omitted). The offensive use of collateral estoppel "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n.4 (1979). Courts have broad discretion in determining whether offensive collateral estoppel is appropriate. *Id.* at 331; *Cotton States*, 749 F.2d at 666.

The issue here is whether to apply the doctrine of offensive collateral estoppel to orders issued by courts in this District remanding under 28 U.S.C. section 1447(c) cases, similar to the Plaintiff's, filed against these same Defendants.[3] Courts are reluctant to apply doctrines of preclusion where an issue is not reviewable on appeal. *Warner/Elektra/Atlantic Corp. v. County of DuPage*, 991 F.2d 1280, 1282 (7th Cir. 1993) ("an unappealable finding does not collaterally estop"); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2nd Cir. 1986) ("inability to obtain appellate review . . . does prevent preclusion"). It is clear that "[u]nder 28 U.S.C. § 1447(d), an order remanding an action to state court pursuant to § 1447(c) is not reviewable on appeal or otherwise, even if the remand order is clearly erroneous."[4] *Poore v. American-Amicable Life Ins. Co. of Tex.*, 218 F.3d 1287, 1291 (11th Cir. 2000); *see also Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002).

---

[3] 28 U.S.C. § 1447(c) provides, in relevant part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

[4] 28 U.S.C. § 1447(d) provides, in relevant part, that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . ."

-3-

The orders upon which the Plaintiff seeks to rely to collaterally estop Merck are orders from courts in this District in the cases of *Kozic v. Merck & Co., Inc., Gena Ghazzi and John E. (Jack) Kilkelly*, Case No. 8:04-CV-324-T-27TBM ("*Kozic*"),[5] and *White v. Merck & Co., Inc., Gena Ortega f/k/a Gena Ghazzi and John E. (Jack) Kilkelly*, Case No. 8:05-CV-243-T-26MSS ("*White*"), which found that the plaintiff in those cases had not fraudulently joined Ortega and Kilkelly as defendants, and thus those courts remanded the cases to state court pursuant to 28 U.S.C. section 1447(c).[6] Therefore, because the Plaintiff seeks to collaterally estop Merck from asserting fraudulent joinder based on non-reviewable remand orders, offensive collateral estoppel is not appropriate, and Merck is entitled to assert its claim of fraudulent joinder before this Court.[7]

B  Fraudulent Joinder

Merck seeks to prevent the remand of this case to state court by alleging that Ortega and Kilkelly were fraudulently joined as defendants and, as such, do not defeat this Court's diversity jurisdiction. When alleging fraudulent joinder, "the removing party has the burden of proving that either: (1) there is no possibility that the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the

---

[5] Gena Ortega was formerly known as Gena Ghazzi. Doc. 3 at 1.

[6] Although neither order is specific as to the statutory basis for remand, in both cases the plaintiff moved for remand pursuant to 28 U.S.C. § 1447(c), and thus the Court assumes that each case was remanded pursuant to that section. *See Kozic*, Doc. 6 at 1; *White*, Doc. 9 at 1.

[7] Moreover, in both *Kozic* and *White*, Merck did not raise the issue, contained in the Declarations of Ortega and Kilkelly (Doc. 18 at Ex. A and B), that neither Ortega nor Kilkelly ever communicated with either the plaintiff or the plaintiff's prescribing physician. Therefore, the issue to be addressed here is not identical to the issue in *Kozic* and *White*, nor was that issue previously litigated, and thus collateral estoppel is not appropriate in this case.

resident defendant into state court." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997).[8] The burden on the removing party is a heavy one. *Id.* To determine whether the case should be remanded, the Court evaluates the factual allegations in the light most favorable to the plaintiff, and resolves any uncertainties about state substantive law in the plaintiff's favor. *Id.*; *see also Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989). These determinations are made based on the plaintiff's pleadings at the time of removal. *Crowe*, 113 F.3d at 1538; *Cabalceta*, 883 F.2d at 1561. In addition to the plaintiff's pleadings, the Court may consider evidence such as affidavits and depositions submitted by the parties. *Crowe*, 113 F.3d at 1538; *Cabalceta*, 883 F.2d at 1561.

The Court will not weigh the merits of the Plaintiff's claim, other than to determine whether the Plaintiff has an arguable claim under state law. *Crowe*, 113 F.3d at 1538. "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Id.* (internal citation and quotation omitted); *see also Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998) ("The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate.") (emphasis in original).

To determine whether the Plaintiff can establish a cause of action against either Ortega or Kilkelly under Florida law, the Court examines the Complaint (Doc. 3). In Count II, the Plaintiff

---

[8] Merck asserts that the Plaintiff cannot establish a cause of action against Ortega and Kilkelly, and does not raise the issue of fraudulently pled jurisdictional facts. Therefore, the second category of fraudulent joinder as outlined in *Crowe* is not at issue here.

asserts a claim for negligence against the Defendants, claiming that the Defendants knew or should have known of the risks associated with Vioxx, and despite that knowledge the Defendants advertised, marketed, sold and distributed Vioxx, failed to adequately and accurately warn prescribing physicians of the risks associated with Vioxx, and concealed the dangerous properties of Vioxx. (Doc. 3 at 8-9). The Plaintiff asserts a claim for negligent misrepresentation against the Defendants in Count III, claiming that the Defendants knew or should have known of the risks associated with Vioxx, and despite that knowledge the Defendants advertised, marketed, sold and distributed Vioxx, the Defendants misrepresented to the Plaintiff and to her prescribing physician the safety and effectiveness of Vioxx, and the Defendants made these representations and concealed adverse information despite their knowledge of the risks associated with Vioxx. (*Id.* at 10-11). In Count IV, the Plaintiff asserts a claim for fraud against the Defendants, claiming that although the Defendants knew of the risks associated with Vioxx, the Defendants fraudulently or intentionally misrepresented to the Plaintiff and to the Plaintiff's prescribing physician the safety and effectiveness of Vioxx, and that the Defendants knew their representations were false. (*Id.* at 12-15).

After filing a Memorandum in Opposition to Remand (Doc. 14), Merck filed a Supplement in Support of Removal (Doc. 18), to which Merck attached sworn Declarations from Ortega and Kilkelly. (Doc. 18, Ex. A and B, respectively). In those declarations, Ortega and Kilkelly swear to several things, including: (1) each worked for Merck as a Professional Representative in the Tampa, Florida District; (2) that district does not include either Orange County or Orlando; (3)

neither Ortega nor Kilkelly ever had any contact with Dr. Iraj Ghahreman Lou ("Dr. Lou");[9] (4) neither Ortega nor Kilkelly ever supervised any other professional representative for Merck who ever discussed Vioxx with Dr. Lou; and (5) neither Ortega nor Kilkelly ever spoke with the Plaintiff about Vioxx. (*Id.*). The Plaintiff has not offered evidence in opposition to these statements. The Court will therefore examine whether the Plaintiff can state a claim against Ortega and/or Kilkelly in light of the information contained in their Declarations.

### 1. Negligence (Count II)

The elements for a negligence claim in Florida are duty, breach, harm, and proximate cause. *Lisanti v. City of Port Richey*, 787 So. 2d 36, 37 (Fla. 2d DCA 2001). In the context of claims against manufacturers arising from damages allegedly caused by the manufacturer's failure to warn of the risks associated with prescription drugs, Florida follows the "learned intermediary" doctrine, which means that the manufacturer's duty to warn of a drug's dangerous side effects is directed to the prescribing physician rather than the patient. *Felix v. Hoffmann-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989); *see also Mitchell v. VLI Corp.*, 786 F. Supp. 966, 970 (M.D. Fla. 1992). In this case, then, any duty to warn of the alleged risks associated with Vioxx would have flowed to Dr. Lou, the Plaintiff's prescribing physician. However, the Declarations of Ortega and Kilkelly clearly show that neither of them, either directly or through representatives under their supervision, communicated with Dr. Lou either in general or specifically about Vioxx. Thus, neither Ortega nor Kilkelly had a duty to warn Dr. Lou, and in the absence of a duty, the Plaintiff

---

[9] Merck identifies Dr. Lou as the Plaintiff's prescribing physician because Dr. Lou is the only medical provider the Plaintiff identifies in her discovery requests. (Doc. 18 at 3, Ex. C). In her pleadings and filings with this Court, the Plaintiff simply refers to a "prescribing physician," without naming that individual.

cannot prove a claim for negligence.[10]  *See Whitt v. Silverman*, 788 So. 2d 210, 221 (Fla. 2001)

(duty is a threshold requirement).

    *2. Negligent Misrepresentation (Count III)*

    To prove negligent misrepresentation, a plaintiff must prove four elements: (1) the

existence of a material misrepresentation; (2) that the representation was made under

circumstances in which the representor either knew of the misrepresentation, was without

knowledge as to its truth or falsity, or should have known of its falsity; (3) that the representor

intended to induce reliance; and (4) the plaintiff justifiably relied on the defendant representor's

representation to the plaintiff's detriment.  *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503-1505

(11th Cir. 1993); *Atlantic Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1331-32 (Fla. 2d DCA

1985).  Liability is limited to the loss suffered:

> (a) by the person or one of a limited group of persons for whose benefit and
> guidance [the representor] intends to supply the information or knows that the
> recipient intends to supply it; and (b) through reliance upon it in a transaction that
> [the representor] intends the information to influence or knows that the recipient so
> intends or in a substantially similar transaction.

*Gilchrist Timber v. ITT Rayonier, Inc.*, 696 So. 2d 334, 337 (Fla. 1997) (*citing* Restatement

(Second) of Torts § 552 (1977)).  Returning to Ortega's and Kilkelly's Declarations, it is clear that

neither of them communicated either directly with the Plaintiff or indirectly with her via

communications to Dr. Lou.  Therefore, Ortega and Kilkelly do not fall within the ambit of

liability as prescribed by the Florida Supreme Court in *Gilchrist*, because neither the Plaintiff nor

---

[10] Even if the "learned intermediary" doctrine did not apply, the Plaintiff would still be unable to prove that Ortega and Kilkelly owed her a duty, because their Declarations clearly establish that not only did they not communicate with Dr. Lou, but they never communicated directly with the Plaintiff.

Dr. Lou falls within the limited category of persons to whom Ortega and Kilkelly would be liable for misrepresentations, namely that "that limited group of persons for whose benefit and guidance [Ortega and Kilkelly] intend[ed] to supply the information or [knew] that the recipient intend[ed] to supply it." *Gilchrist*, 696 So.2d at 337. Thus the Plaintiff cannot prove a claim of negligent misrepresentation against either Ortega or Kilkelly.[11]

### 3. Fraud (Count IV)

To state a claim for fraudulent misrepresentation under Florida law, the plaintiff must allege: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Elders v. United Methodist Church*, 793 So. 2d 1038, 1042 (Fla. 3rd DCA 2001) (internal citation and quotation omitted). This claim must fail for the same reason as the Plaintiff's claim for negligent misrepresentation: Merck has offered undisputed evidence that neither Ortega nor Kilkelly communicated with either the Plaintiff or Dr. Lou, and in the absence of such communication, there can be no fraudulent misrepresentation.[12]

---

[11] The case of *Albertson v. Richardson-Merrell, Inc.*, 441 So. 2d 1146 (Fla. 4th DCA 1983), does not require a different conclusion. As described by that court, the decision in that case is squarely based on the circumstances where "[a] drug manufacturer's detail man makes representations to a physician caring for a pregnant woman." *Id.* at 1149. In *Albertson*, in direct contrast to the facts of the instant case, it was undisputed that the manufacturer's agent made representations to the plaintiff's physician.

[12] Alternatively, the Plaintiff has failed to state a claim for fraud against both Ortega and Kilkelly. Under Florida law, fraud must be pled with particularity. *Morgan v. W.R. Grace & Co.-Conn.*, 779 So. 2d 503, 506 (Fla. 2d DCA 2000); *Robertson v. PHF Life Ins. Co.*, 702 So. 2d 555, 556 (Fla. 1st DCA 1997). A plaintiff must particularly allege specific misrepresentations or omissions of fact, the time, place and manner in which the misrepresentations were made, and how those

After examining the Plaintiff's claims in light of the undisputed evidence Merck offered in the form of the sworn Declarations of Ortega and Kilkelly, the Court finds that the Plaintiff cannot state a claim for negligence, negligent misrepresentation or fraudulent misrepresentation against either Ortega or Kilkelly under Florida law. Therefore, Ortega and Kilkelly were fraudulently joined as defendants. *Kimmons v. IMC Fertilizer, Inc.*, 844 F. Supp. 738, 739 (M.D. Fla. 1994). Because the joinder of Ortega and Kilkelly was fraudulent, it does not defeat this Court's diversity jurisdiction. *Id.* Therefore, this case should not be remanded to state court. Moreover, because Ortega and Kilkelly were fraudulently joined, they should be dismissed as defendants. *Tillman v. R.J. Reynolds Tobacco*, 253 F.3d 1302, 1305 (11th Cir. 2001) (it is appropriate for a federal court to dismiss . . . a defendant and retain diversity jurisdiction if the complaint shows there is no possibility that the plaintiff can establish any cause of action against that defendant); *Tran v. Waste Mgmt., Inc.*, 290 F. Supp. 2d 1286, 1292 (M.D. Fla. 2003).

**III. Conclusion**

Because an order of remand is not an appealable order, Merck was not precluded from raising the issue of fraudulent joinder before this Court. The Plaintiff will not be able to prove her

---

misrepresentations were false or misleading. *Robertson*, 702 So. 2d at 556. The Plaintiff has failed to allege what specific misrepresentations either Ortega or Kilkelly made to Dr. Lou or to the Plaintiff; the allegation that certain statements referred to in a warning letter to Merck were made to "the plaintiff and/or plaintiff's prescribing physician" is clearly deficient. Nor does the Plaintiff allege who made particular misrepresentations, when and where those misrepresentations were made, or how each misrepresentation was false or misleading. Further, in light of the Ortega and Kilkelly Declarations, the Plaintiff will not be able to prove that such statements were made either to her or to her prescribing physician. Finally, the requirement that fraud be pled with particularity also applies to claims for negligent misrepresentation. *Morgan*, 779 So. 2d at 506. Based on the reasoning discussed above, the Plaintiff will not be able to prove a claim for negligent misrepresentation, and for this reason, in addition to the discussion in Section II(B)(2), *supra*, that claim must fail.

-10-

state law claims of negligence, negligent misrepresentation and fraudulent misrepresentation against either Ortega or Kilkelly, and therefore these individuals were fraudulently joined as defendants. Therefore, Ortega and Kilkelly will be dismissed as defendants, and this case will not be remanded to state court. Accordingly, it is

ORDERED THAT the Plaintiff's Motion for Remand (Doc. 7) is DENIED, and Ortega and Kilkelly are DISMISSED as defendants.

DONE and ORDERED in Chambers, Orlando, Florida on May 3, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party